INDIANA BROADCASTING CORPORATION, PETITIONER, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 95414.    Filed March 13, 1964.

*Edwin S. Cohen, Whitman Knapp, Donald Schapiro,* and *Martin
F. Richman,* for the petitioner.

*George H. Becker,* for the respondent.

OPINION

Is the petitioner entitled to deductions for depreciation or amortization of CBS television network affiliation contracts it acquired by the purchase of television broadcasting stations WISH–TV and WANE–TV? That is the principal question presented in this case. The parties agree that its resolution involves the three subsidiary questions of (1) the proper allocation of basis to the contracts in accordance with their value, (2) whether such contracts constitute goodwill, and (3) whether the useful lives of such contracts can be estimated with reasonable accuracy, as required by section 167(a), I.R.C. 1954, and the regulations promulgated thereunder.[4]

We are satisfied, as set forth in our Findings of Fact, that the proof adduced by petitioner establishes the basis to it of the two network affiliation contracts with CBS at $4,625,000 and that this basis was properly and reasonably allocated $4 million to the WISH–TV contract and $625,000 to the WANE–TV contract.[5] Petitioner's evidence, based upon the testimony of a broker experienced in the purchase and sale of television stations and proof of comparative income of WISH–TV and its competitors, was not challenged in any respect by respondent's witnesses and stands uncontradicted.

---

[4] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

·(1) of property used in the trade or business, or

(2) of property held for the production of income.

Sec. 1.167(a)–1 [Income Tax Regs.] Depreciation in general.

(a) Reasonable allowance. Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(f) and § 1.167(f)–1. * * *

(b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination.

Sec. 1.167(a)–3 [Income Tax Regs.] Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill.

[5] Actually the allocation between the two contracts is of little practical consequence in computing deductions for depreciation because the termination dates of the two contracts were substantially identical.

Respondent contends, in the alternative, that the CBS network affiliation contracts of WISH–TV and WANE–TV represent the going concern value of petitioner's business or its customer structure, viz, goodwill, which is not subject to an allowance for depreciation under section 1.167(a)–3, Income Tax Regs. These contracts, respondent argues, gave the two stations assurance of advertisers as customers and, therefore, either directly or indirectly, provided the stations with the opportunity of securing substantial revenue. Petitioner counters with the assertion that the network affiliation contracts do not constitute goodwill. We agree with the petitioner.

The value of a CBS-affiliation contract lies in obtaining programs with high audience appeal which is necessary for securing advertising revenues.[6] The principal value and function of the CBS contracts to petitioner consisted of the supply of attractive programs which it assured. Attractive programs bring advertisers and advertisers produce income.

The fallacy of respondent's position is in the legal conclusion which he draws from the facts. The acquisition of an asset or service that will attract customers is not goodwill. An efficient plant or machine will bring customers, as will an attractive sign or handsome decor, but their cost is not considered a part of goodwill. Nor does a contract to acquire such assets or services constitute goodwill. Cf. *Pittsburgh Athletic Co.*, 27 B.T.A. 1074 (1933), affd. 72 F. 2d 883 (C.A. 3, 1934), involving baseball player contracts which were held not to be goodwill. We do not see how the acquisition of the means of attracting customers can be goodwill.[7]

The evidence demonstrates that by far the largest portion of petitioner's revenue came from sources other than the network. Approximately 74 percent came from nonnetwork programs and announcements derived entirely from sales made by WISH–TV itself through

---

[6] The importance to a television station of a CBS network affiliation contract stems directly from the basic economics of commercial television broadcasting. A television station has nothing to sell its advertisers except the ability to reach an audience. This ability derives, in turn, from the attractiveness to the public of the programs the station broadcasts. A station must either produce programing itself or obtain it from other sources. Up to now, the television networks have been the most valuable sources of programing with high audience appeal. Of the networks, CBS has over the years consistently been able to supply programing with high audience appeal. The affiliation contracts here involved assure the petitioner of this highly prized CBS network programing. Moreover, this programing is supplied under the affiliation contract without any cash outlay. Thus the contract not only increases the station's revenue by increasing its audience but also decreases its operating expenses by reducing the need to purchase programs.

[7] This distinction was pointed out by petitioner's witness Tower, who has had considerable experience with the problems of television stations and management. On cross-examination he was asked whether stations wished to have affiliation contracts with CBS because they felt there would be a great possibility that the stations would acquire advertisers as customers. In reply Tower stated:

"Well, I think there is a missing step there, Mr. Becker. They do it to get large audiences because the CBS network has, as in the past and now does, provide the most popular programming—the best programming in terms of audience appeal. If you have that programming, of that audience appeal, in a market like Indianapolis, you get the greater advertiser interest."

the efforts of its own advertising salesmen or its national sales representative. Therefore, it is clear that the network contract does not provide the bulk of the station's revenues but provides only, by its supply of attractive programs and the audiences they draw, a substantial advantage in the competition for advertising dollars.

Even with respect to the 26 percent of its total revenue which flowed to WISH-TV from network programs, the affiliation contract did not constitute goodwill. This revenue was derived by petitioner from a single affiliation contract with the network itself and not from a collection of individual contracts between petitioner and the advertisers. The station's continued receipt of this revenue can be terminated by a decision of the network not to renew the affiliation contract. This single contract is totally unlike the case of a mass of contracts with a number of customers, which are in a constant state of flux as some let their contracts expire and other persons are continually solicited as additional customers. See and compare *Thrifticheck Service Corporation*, 33 T.C. 1038 (1960), affd. 287 F. 2d 1 (C.A. 2, 1961); *U.S. Industrial Alcohol Co.*, 42 B.T.A. 1323 (1940), affirmed on this issue 137 F. 2d 511 (C.A. 2, 1943); and *Richard M. Boe*, 35 T.C. 720 (1961), affd. 307 F. 2d 339 (C.A. 9, 1962).

It is significant that WISH-TV and WANE-TV began broadcasting in 1954, little more than 2 years before their acquisition by petitioner, and that other television stations had preceded them in their communities. WISH-TV and WANE-TV were not old established businesses of the type normally deemed to have acquired goodwill. We think the sum of $1,974,325.33, allocated to goodwill and other intangible property, including FCC licenses, was sufficient to provide a substantial amount for whatever amount of goodwill, as such, these two stations had built up in their 2 years of operation.

Lastly, we turn to a consideration of the important and pivotal question of whether it is possible on this record to estimate the useful life of these network affiliation contracts with reasonable accuracy and, if so, what that useful life is.

Petitioner asserts that the capital cost of the contracts is properly recoverable through annual deductions over a period of 14 years either (a) because the estimated useful life of the contracts including renewal periods, for depreciation purposes, is 14 years or (b) because no more than six 2-year renewals can be reasonably anticipated. Petitioner also asserts that from the statistical data and analyses in evidence, the estimated useful life of the contracts, within the meaning of section 167(a) and the regulations governing depreciation, can be determined with the degree of accuracy required for depreciation purposes; and that use of a straight-line method of depreciation over a period of 14 years (or original term plus six renewals) produces a reasonable allowance for depreciation. Respondent argues to the

contrary that, regardless of the statistical data and calculations based upon industry experience, no deduction for depreciation or amortization should be allowed because the life of television network affiliation contracts is not limited but is indefinite and indeterminate.

We must necessarily approach this problem against the backdrop of our prior opinion in *Westinghouse Broadcasting Co., Inc.*, 36 T.C. 912 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962), certiorari denied 372 U.S. 935 (1963), the only other case involving depreciation of network affiliation contracts.[8] There the network affiliation contract had 7 months to run on an existing term at the time of its acquisition by the taxpayer, but was renewed during the initial taxable year for an additional term of 24 months. The taxpayer contended, among other things, that the cost should be amortized over this 31-month period without taking into account possibilities of further renewals by the parties to the contract.

At the beginning of our opinion the effect of the renewal provision in the affiliation contract was analyzed and the two extreme positions of the parties set forth. One of the extremes would allow depreciation over the 2-year term; the other would automatically deny all depreciation (36 T.C. at 918–919). In addition to these two extremes, there was available the middle ground, based on several decisions involving renewal clauses in leases and other contracts, that depreciation should be calculated by reference to the initial contract term plus "all its probable renewals." We adopted this middle ground by declaring that "there remains to be determined the probable useful life of the contract with all its probable renewals"; that "the probability of renewals is a question of fact"; that "petitioner must show more than uncertainty as to the length of the contract's useful life"; that "for the purposes of depreciation, determination as to probable useful life must be based upon facts known or estimates made at the time a return is filed" (citing cases); and that while the practice in the trade in valuing network affiliation contracts was to assume two renewals, we did not consider "that an industry practice as to valuation of a contract is a sufficient indication of that contract's probable useful life." Consequently, we concluded (36 T.C. at 922):

Insufficient evidence was introduced from which could be calculated either the average useful life of network affiliation contracts or their usual life span.

In affirming our decision the Court of Appeals for the Third Circuit,

---

[8] The matter of depreciation of the cost of intangible assets having a fixed initial term with possibilities of renewals for further terms has been before the courts in many cases involving contracts, leases, franchises, and similar property. The issue has been whether depreciation should be taken over the period of the initial term without regard to possible renewals, as has been held in some cases, or whether possible renewal terms should be taken into account, as has been held in other cases; and, if renewal terms are to be taken into account, how many such possible additional terms should be included. See *Jos. N. Neel Co.*, 22 T.C. 1083 (1954); *Cleveland Railway Co.*, 36 B.T.A. 208 (1937), which permitted depreciation or amortization of costs relating to renewal agreements.

after noting that the burden of proof was on the taxpayer, stated (309 F. 2d at 282–283) :

> Taxpayer did not adduce any testimony to the effect that based on "experience" in the television industry the number of renewals of the network affiliation contract could be "estimated" with "reasonable certainty" or "reasonable accuracy" as required by the Treasury Regulations earlier cited.
>
> \*    \*    \*    \*    \*    \*    \*
>
> Nor can any probative value with respect to the "probable useful life" of the network affiliation contract here be attributed to the stipulated fact that "between January 1, 1953 and April 1, 1960, a total of 87 NBC affiliation agreements expired in circumstances other than a station going off the air or the acquisition of the affiliate by the network" *since there was no evidence as to the actual life span of those agreements or as to the number of their renewals.* [Emphasis supplied.]

The trial of the instant case was devoted primarily to supplying the essential evidence upon which to determine the probability of future renewals. Since petitioner's own experience during the pertinent taxable years did not provide an adequate basis for making this determination, the inquiry, directed in the *Westinghouse* case, as to the usual lifespan of network affiliation contracts must, according to respondent's regulations, be determined by reference to the "general experience of the industry." This provision is an obvious necessity for new corporations, such as the petitioner, and for others acquiring assets of a type not owned previously. It is essential to a practical administration of the revenue laws. Indeed, we fail to see how the revenue would suffer from the use by a group of taxpayers of a rate derived from general industry experience.

Depreciation, by its very nature, is an estimate of future events distilled from the prologue of history. Precision is not required. *Massey Motors, Inc.*, v. *United States*, 364 U.S. 92 (1960). Analysis of historical evidence traditionally serves as the means for forecasting probabilities of future life. It is commonplace in the tax law to use forecasts of duration of life made in this manner.[9]

Selection of the past experience upon which to base a life-expectancy table in the instant case was made by petitioner's witness Tower. In making this judgment as to the selection of experience, Tower had before him Exhibit 19-S, a compilation of the history of network affiliation contracts from the beginning of the television industry to substantially the date of trial. This compilation covered all of the 84

---

[9] Life-expectancy tables for human beings, constructed on the basis of prior mortality experience, are used to determine the period over which a person purchasing a life estate in property may depreciate his cost for income tax purposes. See *William N. Fry, Jr.*, 31 T.C. 522 (1958), affirmed per curiam 283 F. 2d 869 (C.A. 6, 1960) ; and *Bell* v. *Harrison*, 212 F. 2d 253 (C.A. 7, 1954). Similarly, statistical tables, derived from past experience, as to the probability of voluntary change in a human relationship, such as remarriage, are used in determining tax liabilities. See *Estate of Pompeo M. Maresi*, 6 T.C. 582 (1946), affd. 156 F. 2d 929 (C.A. 2, 1946) ; and *Estate of Jean S. Alexander*, 25 T.C. 600 (1955).

market areas in the United States in which there were three or more television stations in operation on December 31, 1962. It was the joint product of the efforts of petitioner and respondent; and the information thus developed was integrated and, at respondent's request, the result was verified by the CBS and NBC television networks. In the case of each affiliation contract mentioned in the compilation, its date of commencement and, if terminated, its date of termination, was established and stipulated.

From this totality of information, Tower selected those segments of the industry experience which, in his judgment, were germane to the issue, namely, the determination of the estimated useful life of the petitioner's network affiliation contracts for depreciation purposes. Tower testified that he thought two types of experience should be taken into account—one of a broad nature designated "aggregate experience" and a second, narrower type, designated "selected CBS experience."

The "aggregate experience" represented the experience with respect to all of the CBS and NBC network affiliation contracts from 1948 through 1962. These contracts contained comparable provisions to the ones before us. Eliminated from this experience were the ABC contracts, which had a higher incidence of termination, and the few stations owned and operated by CBS and NBC, which were not subject to the risk of termination because of the contractual relationship between the network and the station. The "aggregate experience" included the period of the FCC "freeze" on new stations, in which there were relatively few terminations, and a subsequent period (1953–55) in which there were relatively more terminations as an increased number of new stations came on the air. As Tower explained, over the years of commercial television history there have been "ebbs and flows in the incidents of termination of network contracts."

"Selected CBS experience" took into account experience regarding CBS affiliations only "for periods after which there was at least one other station in the market for 12 months or more that was neither affiliated with NBC nor owned and operated by ABC." This experience was analyzed because it is comparable to the present case in being limited to CBS contracts after there were sufficient stations in the particular market to give CBS the opportunity to choose between its existing affiliate and at least one other station in the community not affiliated with ABC. In order to prevent this experience from being affected by terminations directly occasioned by the third station in the community coming on the air, experience prior to the end of a minimum 12-month stabilizing period following that event was eliminated from consideration.

Then, petitioner's expert statisticians were asked to analyze the "aggregate experience" and "selected CBS experience" as described

by Tower. As a part of their analysis, they derived an annual rate of termination of the contracts for each of the two types of experience through the end of the year 1957. They also made similar determinations for each type of experience through the end of 1958, the end of 1959, and the end of 1962. The annual rates of termination separately so computed showed some variations according to the type of experience and the length of period considered. These separately determined annual rates of termination were then presented to Tower and he was asked his judgment, based on the six rates through 1957, 1958, and 1959 (ranging from 0.040 to 0.068), as to an appropriate single annual rate of termination that might be used by the statisticians in constructing a life expectancy table applicable to these network affiliation contracts.

Tower testified that, taking all factors into consideration, he would use for preparation of a life-expectancy table and calculation of average life an annual rate of termination of 0.050 or 5 percent. In addition to the factors contained in our Findings of Fact, Tower said he also took into account: (1) The long-established policy of Congress and the FCC to encourage the use of UHF to bring on the air a greater number of commercial television stations; (2) the serious consideration given by the FCC to moving television broadcasting "upstairs" whereby all stations would be transmitting on the UHF band; (3) the advent of pay television; and (4) possible technological advances, such as Telstar.

Petitioner's statisticians analyzed the information contained in "aggregate experience" and "selected CBS experience" and found that the statistical data was consistent with the Poisson exponential theory of failure, a statistical method which has been widely used to calculate tables of life expectancy and average life of various items. Based upon the 0.050 annual rate of termination and applying the statistical methods explained in their report and testimony, the statisticians developed the life-expectancy table for network affiliation contracts. This table shows that the *median* life of the contracts is just under 14 years and that the *mean* life of the contracts is approximately 20 years. The mean life gives effect to the fact that under the life-expectancy table a small proportion of the contracts may be expected to have lives that are relatively long in comparison with those of the bulk of the contracts. The calculations with respect to the mean life show that there are about two chances out of three that a contract will terminate before it completes its 20th year.

The answer to respondent's contention that the contracts in question cannot be depreciated or amortized because their life is "indefinite" or "indeterminable" is that almost every asset subject to depreciation has an indefinite or indeterminable life in the sense that no one can

foretell the exact date of its coming to an end.[10]  The life of a particular asset, whether it be an automobile, a telephone pole, or a racehorse, cannot be foretold because human beings are not gifted with such clairvoyance.  All that can be said is that there are certain probabilities of survival and that "average" lives can be determined.  To be sure, the respondent's own regulations recognize this lack of human clairvoyance by referring to "estimated useful life" throughout the depreciation provisions, and, in dealing specifically with intangibles, the regulations refer to the length of life which "can be estimated with reasonable accuracy."  Consequently, we think it is irrelevant that some network contracts in a group of such contracts may be expected to have an unusually long life as compared with the average life of the group.  The statistical analysis presented by petitioner's expert witnesses takes such probability into account and, in determining average life, gives it the proper mathematical weighting.  The fact that experience, opinions, or statistical projections may indicate that a few units may attain an exceptional or unusual age is disregarded in depreciation practice, except to the extent that such long-lived assets influence calculation of average life.

At the trial and on brief the respondent criticized Tower's selection of an annual rate of termination of 0.050 (5 percent) on two grounds.  First, respondent argues that the rate used in determining the probability of termination of petitioner's affiliation contracts is distorted by a heavy concentration of terminations in the years 1953–55 (period of adjustment) and should be lower than the rate of termination reflected in the segments of industry experience selected by Tower.  Second, as a general matter, respondent asserts that a more restricted subgrouping of industry experience was required to prepare an applicable life-expectancy table.  We think these assertions are refuted by the record and are contrary to the well-established practices for determining life expectancy in tax matters.  Perhaps the most we can say about respondent's evidence is that it presents a modest challenge to the rate of termination used.  Of course, any selection of prior experience on which to base an estimate of future life can be subjected to some criticism.  But the controlling considerations relevant here are that petitioner's contracts are of the same type as the contracts whose history of termination is reflected in Exhibit 19–S, and that petitioner's contracts are subject to many and varied competitive economic forces such as gave rise to the prior terminations of such contracts.

[10] A network affiliation contract is unlike distributorships and other arrangements of "indefinite" length where a franchise holder may have rights to resist termination, either by specific terms of contract or by general rules of law.  See *Coca-Cola Bottling Co.,* 6 B.T.A. 1333 (1927), where the contract could not be canceled so long as the taxpayer "vigorously and properly" pushed the sale of bottled Coca-Cola ; and *Allied Equipment Co.* v. *Weber Engineered Products, Inc.,* 237 F. 2d 879 (C.A. 4, 1956), involving a distributorship under an at-will contract.

Likewise, we are not persuaded by respondent's contention that the standard error used by petitioner in preparing the life-expectancy table is unreliable because the "underlying conditions and circumstances in the television industry do not constitute a *stable force* extending into the future." This general contention, without more, carries little weight, especially since the same thing can be said about any youthful industry in these times of rapidly changing scientific technology. As we have previously pointed out, depreciation requires only an estimate, not exactness. It seems to us that the petitioner has offered sufficient evidence, based on *general industry experience* over 15 years, to establish the "average" lives of these network affiliation contracts with *reasonable accuracy*.

Respondent's attack on the petitioner's position stresses the "lack of comparable data" upon which petitioner's estimates were based. This assertion totally disregards the testimony of Tower, who gave his opinion as to the industry experience "reasonably comparable to the situation as it existed in Indianapolis for WISH-TV during the years" in issue.

On brief the respondent makes a station-by-station examination of industry data attempting to show that individual stations experiencing terminations included in the industry experience selected by Tower are in certain details dissimilar to petitioner's television stations.[11] We think this approach is wholly inconsistent with the respondent's regulation which permits a determination of useful life to be made by reference to "general experience in the industry." [12] What respondent has done in his brief is to ferret out factors reflected in general experience which he argues would tend to project an unduly long-life expectancy as applied to petitioner, and to ignore all countervailing factors. Naturally, some instances included in any general experience will contain factors tending to a longer life expectancy than might be

[11] Respondent set forth a series of individual objections asserting lack of comparability of 23 specific terminations with petitioner's situation because of various circumstances, many of them speculative. In addition, respondent has attempted to dismiss entirely segments of experience including 56 terminations assertedly occurring prior to the arrival of a third station in the particular market area. But the data shows that 15 of these 56 terminations occurred at times unrelated to the arrival of any station in the market; 17 represent cases in which CBS and NBC were not affiliated with the same station at the time of the termination; and 5 represent cases in which the network did not make the termination when the second station came on the air but continued the dual affiliation with the first station until the third station arrived.

[12] It is noteworthy that while respondent disagrees with the conclusions which petitioner's expert witnesses drew from prior experience of other television affiliation contracts, he does not contend that such experience is irrelevant to the matter at hand. Indeed, the start of the present controversy, Rev. Rul. 57–377, 1957–2 C.B. 146, described in some detail respondent's interpretation of industry experience regarding affiliation contracts. In that ruling respondent found the existence of sufficient similarity in television affiliation agreements to permit promulgation of a ruling which was by its terms applicable to affiliation contracts throughout the industry. The opinions of both this Court and the Court of Appeals in *Westinghouse* also reflect the premise that conclusions applicable to a specific contract can be drawn from experience as to other contracts in the hands of other owners.

appropriate to a particular taxpayer, while other instances included in the general experience will contain factors tending to a shorter expectancy. The theory behind the regulation is that these factors will tend to balance off, and that the statistically derived life expectancy, uniformly applied, will produce a result proper both for the taxpayers and the Government. It is inconceivable that a petitioner before this Court, endeavoring in good faith to develop a rate of depreciation based on "general experience in the industry," can be required at its peril to prove that all cases included in its statistics are in every respect identical to the petitioner's circumstances, or else forfeit all depreciation. This rule permitting use of general industry experience is both logical and practical: *Logical* because the National Treasury cannot suffer from the use of a general average by a group of taxpayers; and *practical* because it alleviates the burden which would be placed on the courts to hear testimony of numerous witnesses regarding the detailed facts of other cases in the industry to determine case by case the degree of their similarity to the taxpayer's situation.

In the light of the evidence adduced by petitioner, we are convinced that none of respondent's criticisms warrant our holding that petitioner's case is so different from that of the general experience of the industry that the useful life or probable number of renewals of its contracts cannot be determined with the degree of accuracy required to permit a "reasonable allowance" for depreciation. Accordingly, we hold that the petitioner is entitled to depreciation deductions on its CBS network affiliation contracts on a 20-year straight-line method. Cf. *WDEF Broadcasting Co.* v. *United States*, 215 F. Supp. 818 (E.D. Tenn. 1963); and *Birmingham News Co.* v. *Patterson, Jr.*, 224 F. Supp. 670 (N.D. Ala. 1963).

Reviewed by the Court.

*Decision will be entered under Rule 50.*