*Decisions will be entered under Rule 50.*

GULF TELEVISION CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3348-66. Filed September 25, 1969.

*Whitman Knapp*, *Donald Shapiro*, *Michael O. Finkelstein*, and *Paul R. Herman*, for the petitioner.

*George H. Jelly*, for the respondent.

1050

1052

OPINION

KERN, *Judge:* Petitioner in its income tax returns for the taxable years took deductions on account of the depreciation or amortization of a "CBS Network affiliation contract." The methods used by petitioner in calculating the amounts of these deductions are described in the stipulation as follows:

On September 1, 1956, petitioner, on its books of account, commenced to amortize its claimed basis of $2,740,000 allocated to the CBS affiliation contract, in nineteen equal monthly installments ending March 30, 1958. Beginning October 1, 1957, when the contract was extended for an additional two-year term, by virtue of neither party exercising its option to terminate the contract six months prior to its expiration date, petitioner commenced to amortize the then-remaining unamortized balance of the claimed basis of the contract in equal monthly installments over the contract as extended (thirty months through March, 1960). A similar recalculation of the period for amortization of the remaining unamortized claimed balance was made as of October 1, 1959, when the contract was extended for another two-year term.

Respondent disallowed these deductions on the ground that the network affiliation contract "does not have a useful life which can be determined with reasonable accuracy as required by section 167 of the Internal Revenue Code of 1954." This is equivalent to a determination that the contract had an indeterminable useful life under the pertinent statute and regulations.

In its petition petitioner alleges that respondent erred in failing to allow deductions for depreciation or amortization with regard to this contract not in the amounts claimed in the returns but in amounts reflecting an estimated useful life of the contract of 20 years. This allegation was consistent with our holding in *Indiana Broadcasting Corporation*, 41 T.C. 793, revd. 350 F. 2d 580 (C.A. 7), certiorari denied 382 U.S. 1027, which involved a similar contract held by a television corporation owned by the same interests as those which owned petitioner. In that case we held that the testimony adduced by the taxpayer warranted a conclusion that the taxpayer had proved with reasonable accuracy an average or useful life or probable number of

renewals of its CBS network affiliation contract which entitled the taxpayer to deduct its cost of such contract on a 20-year straight-line method.

At the trial of this case petitioner announced that it would no longer rest its argument on the theory advanced by it in the *Indiana* case. On brief it states that it "does not now elect to challenge the Court of Appeals decision in *Indiana* and is therefore not requesting a finding of average or useful life." In his opening statement counsel for petitioner stated in effect that petitioner would contend that depreciation or amortization should be computed by a so-called reasonable-certainty rule under which, it is argued, a contract providing for successive renewals should be amortized "over the original term plus that number of renewals as are reasonably certain." [5] Subsequent to the trial petitioner filed a motion under Rule 17(d) for leave to amend the petition to conform to the proof which was granted. This amended petition alleges *inter alia* that at the close of each of the taxable years "there was no reasonable certainty of more than six future renewals of petitioner's network affiliation contract beyond the then current year" and that its cost basis for the contract "depreciated over a period including the then current term and six two-year renewal terms produces a reasonable allowance for depreciation."

At the trial petitioner's expert witnesses testified that in their opinion there was not reasonable certainty at the close of each taxable year that the affiliation contract would be renewed for more than six future terms in that there was at least one chance in three that the contract would not be renewed. [6]

On brief petitioner states its position to be "that for each tax year depreciation of that portion of the contract cost which was unrecovered as of the beginning of the year should be allowed on the basis of a period which includes the then current term of the contract and six future renewal terms. Under this method, the period for depreciation

---

[5] On brief petitioner also refers to this technique as the multiple-renewal method.

[6] In connection with this latter phase of its argument, petitioner cites Rev. Rul. 67-113, 1967-1 C.B. 55. In that revenue ruling, respondent ruled in favor of an airline which sought to amortize costs of obtaining temporary certificates of public convenience and necessity issued by the Civil Aeronautics Board (CAB) for the purpose of serving a new air route. The facts as stated in that revenue ruling were that CAB temporary route certificates are limited to run for stated periods of time, usually 5 years, and renewal of such certificates is contingent upon approval by the CAB after a full-scale hearing held by the CAB. The CAB may also revoke these temporary certificates before their terms expire on its own initiative if the CAB determines, for example, that the certified air routes have not generated sufficient traffic to justify their operation. *Upon information submitted by the taxpayer which indicated that during a 10-year period the CAB revoked or did not renew the taxpayer's temporary certificates as to approximately one third of the cities which the CAB had certified on a temporary basis,* the respondent ruled that renewals of the authority granted on a temporary basis did not occur with "reasonable certainty" and consequently that amortization was to be allowed for the stated term of the CAB temporary certificate.

is continually extended and the contract cost is never fully recovered as long as the contract lasts."

Respondent's argument may be summarized as follows: Petitioner's network affiliation contract which provided for automatic renewal unless one of the parties gave notice 6 months "prior to the expiration of the then current two-year period that the party sending such notice does not wish to have the term extended," which therefore might continue indefinitely and which fluctuates and even increased in value, is not a wasting asset properly subject to depreciation; and even if the contract be considered as an intangible asset useful for only a limited period, the length of such limited period cannot be estimated with reasonable accuracy by reference to the testimony adduced herein by the petitioner or on the record before us and therefore no depreciation thereon is allowable.

The Code section pertinent to the instant controversy is section 167(a), which provides as follows:

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

Pursuant to his authority granted by section 7805(a) to prescribe all needful rules and regulations under the Internal Revenue title, respondent has promulgated Income Tax Regulation section 1.167(a)-3 interpreting the applicability of section 167 to intangible property used in a taxpayer's trade or business. That regulation states as follows:

Sec. 1.167(a)-3. Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

Although section 167(a) itself does not mention intangible property, as interpreted by respondent's regulations over the years beginning with Treasury Regulations 45, art. 163, issued under the Revenue Act of 1918, through section 1.167(a)-3 of the regulations issued under section 167 of the 1954 Code, the statute has been construed as permitting a reasonable allowance for the depreciation of an intangible

asset only if its duration can be ascertained with "reasonable certainty" or "reasonable accuracy."

As we understand petitioner's contentions, petitioner does not directly attack respondent's interpretation of section 167 as stated in his regulations. Instead petitioner, relying on *Westinghouse Broadcasting Co.*, 36 T.C. 912, affd. 309 F. 2d 279 (C.A. 3), certiorari denied 372 U.S. 935, and certain cases cited therein,[7] contends that the regulation's test applied to determining the useful life of a renewable intangible asset such as a lease or other contract is met where the evidence of record shows that only a certain number of renewals, and no more, can be anticipated with "reasonable certainty." Petitioner argues that in these cases a doctrine relating to intangible assets created by and existing pursuant to the renewable contracts was developed which was stated as an administrative rule by respondent in T.D. 4957, 1939-2 C. B. 87, in pertinent part as follows:

In determining deductions from gross income of items in respect of depreciation or amortization of the cost of improvements erected upon leased premises or the cost or other basis of a lease, including all capital expenditures in connection therewith, in cases in which the lease contains an unexercised option of renewal, the manner of spreading such depreciation or amortization over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular case. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease or the cost of improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal. * * *

The logical connotation of this rule is that if the facts show with reasonable certainty that a lease will be renewed "the cost or other basis of the lease * * * shall be spread * * * over the number of years the lease has to run, * * * taking into account any right of renewal." It seems obvious to us that there is also implicit in this "rule" a requirement that the facts show with reasonable certainty not only the extent of the original or primary term granted by the lease but also the length of the period or periods for which the lease will be renewed so that the cost of the lease can be spread over the entire number of years the lease has to run taking into account the reasonably certain renewals.

---

[7] Petitioner cites the following 12 cases cited in the *Westinghouse* case: *William Penn Hotel Co.*, 23 B.T.A. 566 (1931), acq. X-2 C.B. 77 ; *Harris-Emery Co.*, 37 B.T.A. 958, 965 (1938) ; *Leonard Refineries, Inc.*, 11 T.C. 1000, 1010 (1948), acq. 1949-2 C.B. 2; *Alamo Broadcasting Co.*, 15 T.C. 534 (1950), acq. 1951-1 C.B.; *Hens & Kelly, Inc.*, 19 T.C. 305 (1952), acq. 1953-1 C.B.; *Jos. N. Need Co.*, 22 T.C. 1083 (1954), acq. 1954-2 C.B. 5; *Cleveland Railway Co.*, 36 B.T.A. 208 (1937), acq. 1937-2 C.B 5; *East Kauai Water Co.*, 11 T.C. 1014 (1948) ; *Morris Nachman*, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5, 1951) ; *Tube Bar, Inc.*, 15 T.C 922 (1950) ; *V. P. Shufflebarger*, 24 T.C. 980 (1955) ; *KWTX Broadcasting Co.*, 31 T.C. 952 (1959), affd. 272 F. 2d 406 (C.A. 5, 1959).

Petitioner stresses the language used by us in *Westinghouse Broadcasting Co., supra* at 920, 921, as follows:

Petitioner points to *Flynn, Harrison & Conroy, Inc.*, 21 B.T.A. 285, 287 (1930), which seems to hold that contract renewal provisions or actual renewals may be ignored in determining useful lives of contracts and that estimates need not be made of the probability of renewal. This doctrine has not been followed by this Court in subsequent cases involving leases (*William Penn Hotel Co., supra; Harris-Emery Co.*, 37 B.T.A. 958, 965 (1938); *Leonard Refineries, Inc.*, 11 T.C. 1000, 1010 (1948); *Alamo Broadcasting Co., supra; Hens & Kelly, Inc., supra; Jos. N. Neel Co.*, 22 T.C. 1083 (1954)), franchises (*Cleveland Railway Co.*, 36 B.T.A. 208 (1937); *East Kauai Water Co., Ltd., supra*), and licenses (*Morris Nachman, supra; Tube Bar, Inc., supra; V .P. Shufflebarger*, 24 T.C. 980 (1955); *KWTX Broadcasting Co.*, 31 T.C. 952 (1959), affd. 272 F. 2d 406 (C.A. 5, 1959)). This Court specifically stated, in *Cleveland Railway Co., supra* at 211, that the same rationale governs leases, franchises, and contracts and affirmed that view in *Harris-Emery Co.*, 37 B.T.A. 958, 964–965 (1938). This Court made clear its divorcement from the *Flynn, Harrison* view in its unanimous opinion in *Morris Nachman, supra* at 1211; "In addition, we are confronted with the fact of actual renewal of the license during the year before us, and the vitality of this even cannot be minimized." We decline to follow the *Flynn, Harrison* doctrine in this proceeding.

Petitioner argues that by the use of this language, even though it was obviously directed only to the proposition that contract-renewal provisions are not to be ignored in determining the useful lives of contracts, we have committed ourselves to the proposition that the rules relating to the depreciation of a lease contract or a contract granting a franchise to use the public streets for long periods with options of negotiating renewals granted either by contract or custom should be equally applicable to all contracts, including a network affiliation contract for a short initial period and automatically renewable for successive periods in perpetuity unless one of the parties formally notifies the other of its election not to renew. Therefore, petitioner would have us conclude, this Court has indicated its acceptance of the so-called reasonable-certainty rule under which petitioner justifies the depreciation now claimed by it.

In our opinion this argument is vitiated by other observations made in that case which are more relevant to the *ratio decidendi* therein, as for example the following from pages 918 and 919:

We agree with respondent that this contract has not been shown to have a determinable useful life.

The contract was renewable automatically unless, at least 90 days prior to the expiration of any 2-year term, either party sent the other written notice of intention not to renew. Petitioner says this renewal clause adds nothing to the contract since parties to any contract may, by agreeing to do so, renew any contract whether or not a renewal clause is present. Absent the renewal clause, it might appear that this contract had a 2-year term and its cost should be de-

preciated over the 7 months of that term remaining when petitioner purchased the contract.

By the same token, this automatic renewal clause is no different in effect from a provision for an indefinite term with the right in either party to cancel as of the next biennial anniversary date of the contract. Under such circumstances, the contract has an indeterminate useful life and therefore no deduction may be taken on account of depreciation. *Coca-Cola Bottling Co.*, 6 B.T.A. 1333 (1927). See *David Dab*, 28 T.C. 933 (1957), affd. 255 F. 2d 788 (C.A. 2, 1958).

We also pointed out (at page 919) that the large amount of money paid by the taxpayer for the contract [8] made it "incredible that petitioner was not reasonably certain of renewals"; and that "The fact that the contract conforms to the maximum term permissible under the Federal Communications Commission * * * suggests that the ostensible term is not necessarily the term * * * contemplated by the parties to such a contract."

We also said that "Petitioner must show more than uncertainty as to the length of the contract's useful life," and in concluding that the taxpayer not only failed to prove that the contract had the specific useful life claimed by the taxpayer but also failed to prove that "respondent erred in his determination that the contract had an indeterminable useful life," we again pointed out that "In form, the contract was perpetually renewable on the same terms without either party thereto taking any action or attempting to reach a fresh meeting of the minds." 36 T.C. at 921, 922.

We are unable to agree with petitioner's contention that the language used by us in *Westinghouse Broadcasting Co., supra*, requires the application in this case of a test similar to the test stated in T.D. 4957, *supra*.

It is true that in some cases the courts have concluded that the useful life of the contract for depreciation purposes is ascertainable and may be estimated with reasonable accuracy as being the period of the original term without regard to renewals. *Birmingham News Co. v. Patterson*, 224 F. Supp. 670 (1963) affirmed on opinion below, 345 F. 2d 531 (C.A. 5), is an example. In that case the initial term of the contract was a long period (30 years) with optional renewals for long periods (10 years) unless notices to terminate were given so long before the end of the term or renewals (2 years) as to indicate the contemplation by the parties of the necessity or desirability of renegotiating the contract, the amount paid for the contract was not obviously excessive if there were not renewals, and the initial term of the contract was not a short one selected by the parties only to conform to a regulation of an administrative body. The facts involved in those cases differ so

---

[8] In this case the amount of the total purchase price allocated by petitioner to the contract was $2,740,000.

materially from the facts in this case that they are not helpful in a solution of this case and do not sustain the burden of petitioner's argument.

In further support of its contention, petitioner cites section 178(c),[9] enacted into the 1954 Code as part of the Techical Amendments Act of 1958, and regulations promulgated thereunder [10] for the proposition

[9] SEC. 178. DEPRECIATION OR AMORTIZATION OF IMPROVEMENTS MADE BY LESSEE ON LESSOR'S PROPERTY.

(a) GENERAL RULE.—Except as provided in subsection (b), in determining the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization—

(1) in respect of any building erected (or other improvement made) on the leased property, if the portion of the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) remaining upon the completion of such building or other improvement is less than 60 percent of the useful life of such building or other improvement, or

(2) in respect of any cost of acquiring the lease if less than 75 percent of such cost is attributable to the portion of the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) remaining on the date of its acquisition,

the term of the lease shall be treated as including any period for which the lease may be renewed, extended, or continued pursuant to an option exercisable by the lessee, unless the lessee establishes that (as of the close of the taxable year) it is more probable that the lease will not be renewed, extended, or continued for such period than that the lease will be so renewed, extended, or continued.

(b) RELATED LESSEE AND LESSOR.—

\*       \*       \*       \*       \*       \*       \*

(c) REASONABLE CERTAINTY TEST.—In any case in which neither subsection (a) nor subsection (b) applies, the determination as to the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization—

(1) in respect of any building erected (or other improvement made) on the leased property, or

(2) in respect of any cost of acquiring the lease, shall be made with reference to the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee), unless the lease has been renewed, extended, or continued or the facts show with reasonable certainty that the lease will be renewed, extended, or continued.

[10] Sec. 1.178–3. Reasonable certainty test.

(a) In any case in which neither section 178(a) nor (b) applies, the determination as to the amount of the deduction allowable to a lessee for any taxable year for depreciation or amortization in respect of any building erected, or other improvements made, on leased property, or in respect of any cost of acquiring a lease, shall be made with reference to the original term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) unless the lease has been renewed, extended, or continued, or the facts show with reasonable certainty that the lease will be renewed, extended, or continued. In a case in which the facts show with reasonable certainty that the lease will be renewed, extended, or continued, the term of the lease shall, beginning with the taxable year in which such reasonable certainty is shown, be treated as including the period or periods for which it is reasonably certain that the lease will be renewed, extended, or continued. If the lessee has given notice to the lessor of his intention to renew, extend, or continue a lease, the lease shall be considered as renewed, extended, or continued for the periods specified in the notice. See paragraph (e) of sec. 1.178–1.

(b) The reasonable certainty test is applicable to each option to which the lease is subject. Thus, in a case of two successive options, the facts in a particular taxable year may show with reasonable certainty that the lease will be renewed pursuant to an exercise of only the first option; and, beginning with such year, the term of the lease will be treated as including the first option, but not the second. If in a subsequent taxable year the facts show with reasonable certainty that the second option will also be exercised, the term of the lease shall, beginning with such subsequent taxable year, be treated as including

that both Congress and respondent regard the reasonable-certainty rule which petitioner contends should be applied in the instant case as a sound, proper, and administratively workable rule when dealing with the problem of leases or other contracts having multiple possible renewal terms.

Section 178 by its terms relates to "Depreciation or Amortization of Improvements made by Lessee on Lessor's Property." Its context as well as its legislative history [11] clearly indicate that it was intended to apply only to depreciation problems incident to a lease of improved real estate with a substantial initial term and a provision for a limited number of optional renewals or extensions thereof also for substantial periods. Income Tax Regulations section 1178–3 (b) and (c) use as examples leases having an initial term of 30 years with two renewal options of 5 years each. In such a case there is no question but that the intangible (i.e. the lease) is "for only a limited period" and that the length of it "can be estimated with reasonable accuracy" within the purview of Income Tax Regulations section 1.167(a)–3, *supra*. The period will be not less than 30 years and if certain facts are shown with reasonable certainty it may be 35 years or 40 years. Thus the rea-

---

both options. Although the related lessee and lessor rule of section 178(b) and paragraph (d) of sec 1.178–1 does not apply in determining the period over which the cost of acquiring a lease may be amortized, the relationship between the lessee and lessor will be a significant factor in determining whether the "reasonable certainty" rule of section 178(c) and this section applies.

(c) The application of the provisions of this section may be illustrated by the following examples:

*Example* (1). Corporation A leases land from lessor B for a period of 30 years beginning with January 1, 1958. Corporation A and lessor B are not related persons. The lease provides that Corporation A will have two renewal options of 5 years each at the same annual rental as specified in the lease for the initial 30 years. Corporation A constructs a factory building on the leased land at a cost of $100,000. Corporation A was not, on July 28, 1958, under a binding legal obligation to erect the building. The construction was commenced on August 1, 1958, and was completed and placed in service on December 31, 1958. On January 1, 1959, Corporation A has 29 years remaining in the initial term of the lease. The estimated useful life of the building on January 1, 1959, is 40 years. The location of the leased property is particularly suitable for Corporation A's business and the annual rental of the property is lower than A would have to pay for other suitable property. No factors are present which establish that these conditions will not continue to exist beyond the initial term of the lease. Since the period remaining in the initial term of the lease on January 1, 1959 (29 years) is not less than 60 percent of the estimated useful life of the building (60 percent of 40 years, or 24 years), the provisions of section 178(a) and paragraph (b)(1) of sec. 1.178–1 do not apply, and since Corporation A and lessor B are not related, section 178(b) and paragraph (d) of sec. 1.178–1 do not apply. However, since the facts show with reasonable certainty that Corporation A will renew the lease for the period of the two options (10 years), the cost of the building shall be amortized over the term of the lease, including the two renewal options, or 39 years.

*Example* (2). Assume the same facts as in example (1), except that a term of 30 years is the longest period that lessor B is willing to lease the unimproved property; that there was no agreement that Corporation A will have any renewal options; and that any other location would be as suitable for Corporation A's business as the leased property. Since the facts do not show with reasonable certainty that the initial term of the lease will be renewed, extended, or continued, Corporation A shall amortize the cost of the building over the remaining term of the lease, or 29 years.

[11] See S. Rept. No. 1983, 85th Cong., 2d Sess., pp. 25–27, 134–138.

sonable-certainty test referred to in section 178(c) of the Revenue Code of 1954 and Income Tax Regulations section 1.178–3 presupposes that Income Tax Regulations section 1.167(a)–3 has been satisfied in that the intangible asset (i.e., the lease of improved real estate) has been shown to be "of use in the business or in the production of income for only a limited period, *the length of which can be estimated with reasonable accuracy*" (Emphasis supplied.)

We dismiss as completely untenable any suggestion that the provisions of section 178 and regulations section 1.178–3 referring to a reasonable certainty test in connection with the amortization of leases indicate congressional approval of any reasonable-certainty rule such as that advocated herein by petitioner having general application to all intangible assets created by contracts or having particular application to a network affiliation contract such as the one involved in the instant case which was for a nominal term of 2 years (obviously fixed in a formal compliance with the rules of the Federal Communications Commission) "perpetually renewable on the same terms without either party taking any action * * * to reach a fresh meeting of the minds" unless either party sent to the other a written notice of intention not to renew, and acquired by the taxpayer at a cost (in this case of $2,740,000) which clearly indicated that both parties to the contract contemplated the automatic renewals of the contract over an indefinite period of time.

Petitioner has made no attempt to prove the length of the useful life of the network contract here involved. As we have pointed out it specifically abjures the theory advanced by the taxpayer in *Indiana Broadcasting Corporation, supra,* and on brief stated its election not to challenge the Court of Appeals in that case as a reason for "not requesting a finding of average or useful life." While there are certain statistics in the record with regard to terminations of network contracts petitioner has not urged that there was such a definite or consistent pattern as to provide a basis for estimating under any statistical method (the "Poisson exponential theory of failure" or other less esoteric method) the average of useful life of the network contract. Thus we do not have before us here the problem considered by this Court and the Court of Appeals in *Indiana Broadcasting Corporation, supra,* or by the Court of Appeals in the recent case of *Super Food Services, Inc.* v. *United States,* 416 F. 2d 1236 (C.A. 7, 1969). The absence of any contention as to a statistical pattern of terminations also distinguishes this case from the situation covered by Rev. Rul. 67–113, 1967–1 C.B. 55, referred to in footnote 6, *supra.*

We also point out that petitioner's proof herein does not form the basis of predicting the useful life of its contract by estimating some definite future date before which a termination of the contract is more probable than after such date or after which a termination is more probable than before. As we have indicated petitioner's proposed reasonable-certainty rule assumes a future date with reference to which estimates of probability of terminations are made (12 years after the date of the expiration of the current contract period) which recedes into the future—every 2 years—and thus constantly extends the estimate of the limited period of the useful life of the intangible.

Petitioner has attempted to meet its burden of proving that respondent erred in his determination that the network affiliation contract sought to be amortized by petitioner did not have a useful life which could be determined with reasonable accuracy by the testimony of one of its officers and of certain witnesses expert in the field of communications and particularly in that of television to the effect that in their opinion there was no reasonable certainty at the close of each of the taxable years here in question that the contract then in existence would be renewed for more than six future terms in that there was at least one chance in three that it would not be so renewed.

These witnesses predicated their opinions principally on the following considerations: (1) Their view that technological and regulatory developments in the field of UHF broadcasting would lead to a rapid increase in the number of UHF stations in competition with existing VHF stations resulting in a period of instability in the television industry similar to that experienced at the end of the "freeze" in 1952 when many new televisions came on the air and many affiliation contracts were terminated,[12] (2) their view that the development of CATV and, possibly, Pay-TV might lead to changes in network affiliation relationships and result in terminations, and (3) their view that the development of satellite-to-home broadcasting and of home record devices might completely destroy the network system.

Their testimony does not indicate that any of these technological or regulatory possibilities will precipitate events causing the termination of petitioner's contract at the end of, but not beyond or before, any particular period of time after it was acquired. It does not show which of the various potential developments had the greater likelihood of precipitating termination, how such a termination-causing event would would be most likely to happen, or when it would occur. In our opinion this testimony would only support a finding that there was a lingering

---

[12] In connection with the fear expressed by these witnesses that contract terminations might result from an increase in the number of UHF stations it was pointed out that the Houston-Galveston area was ideally suited for UHF stations since it was flat, had little foliage and its population was concentrated.

possibility during the taxable years that changing economic, legal, and technological conditions might in some way cause a termination of petitioner's contract at some time subsequent to the then current term which could not be even roughly approximated—much less "estimated with reasonable accuracy." The proper adjective to describe the possibility of termination disclosed by this testimony is "indefinite." We have held that "indefinite expectations and suppositions are not enough to support a claim for obsolescence," see *James D. Dunn*, 42 T.C. 490, 495; *Steven's Pass, Inc.*, 48 T.C. 532, 541. In this case the potential developments referred to in the testimony of petitioner's expert witnesses are quite similar to elements contributing to economic obsolescence and we feel that "indefinite expectations and suppositions" are equally inappropriate in cases involving the amortizations of intangibles.

Any doubts as to the indefiniteness of the elements making up petitioner's theory are laid at rest by the testimony of respondent's expert witness who was not only thoroughly qualified (as were also petitioner's expert witnesses) but who was also completely disinterested in the outcome of this litigation (which could not be said of petitioner's witnesses). This witness testified that a study of 60 TV markets in which there were three commercial VHF stations in operation (as in the Houston-Galveston area) made by him covering the years subsequent to 1955 disclosed that there were changes in network affiliations in only 3, that the changes were made for various reasons, some terminations being at the election of the stations and the others being made by the networks, and that these changes resulted not in a complete loss of a network contract but only in a change of affiliation. He was of the opinion that the danger of termination did not increase with the passing of time and that the time when the termination of a network affiliation contract might be anticipated was completely unpredictable.

In view of the testimony of respondent's expert witness and of the facts· disclosed by the record we are not bound by the conclusions of petitioner's experts even though each of them testified that he had an opinion as to whether there was reasonable certainty that an affiliation contract such as the one involved herein would be renewed for more than six successive terms, that his opinion was that there was no reasonable certainty that it would be so renewed, that he had an opinion as to whether there was more than one chance in three that such a contract would not be renewed for more than six successive terms, and that his opinion was that there was more than one chance in three that such a contract would not be renewed for more than six successive terms. See *Fitts' Estate* v. *Commissioner*, 237 F. 2d 729, 732–733 (C.A. 8). For the reasons indicated above we are in disagreement with their opinions as

to the periods of time to be used in computing the amortization of petitioner's contract.

The testimony of petitioner's officer pointed to disadvantageous circumstances surrounding station KHOU–TV during the taxable year which caused him to fear the possibility that CBS might terminate the affiliation contract and to share the opinion of petitioner's expert witnesses that there was no reasonable certainty that the contract would be renewed for more than six successive terms and that there was more than one chance in three that the contract would not be renewed for more than six successive terms. This officer particularly viewed with alarm the facts that prior to 1958 the station was licensed to Galveston instead of Houston, that its broadcasting tower was so located that it could not send a completely satisfactory signal over the entire Houston area, that it had no local newspaper affiliation, that it had not had prior radio affiliation with CBS, and that as a result of mediocre management of the station prior to its acquisition by petitioner it did not have a satisfactory share of business in the Houston market area. Again we point out the causative and chronological indefiniteness of the depressing elements referred to in this testimony. We also point out that within 2 years after petitioner acquired the station and the contract its city of license was changed to Houston, it acquired within 7 or 8 years a completely satisfactory broadcasting tower, it was affiliated through common ownership of stock with three other corporations operating four television stations all of which had CBS affiliation, and the major stock interest in these corporations (including petitioner) was held by the parties controlling the New York Herald Tribune which was at that time a newspaper well known and influential throughout the country. We also point out that petitioner's officers as of the end of the taxable year in which the network affiliation contract was acquired allocated as its cost the sum of $2,740,000 and that it was worth more in 1968 than in the year of its acquisition. Again we conclude that in view of the testimony of respondent's expert (and disinterested) witness and of the facts of record herein the opinion expressed by petitioner's officer with regard to the certainty or lack of certainty in connection with the renewal of this contract for more than 6 times is unconvincing and does not persuade us that respondent erred in his determination.

After a thorough consideration of the entire record in the instant proceedings, including the expert testimony introduced on behalf of both petitioner and respondent, we conclude that petitioner has not shown a reasonable basis for predicting, with reasonable accuracy or reasonable certainty, the expected useful life of it network affiliation contract. The evidence of record fails to show beyond the level of

speculation when petitioner's contract may become valueless to it or to CBS and thus cause its termination by either, nor does the evidence show beyond the level of speculation which of the many possible causes for termination of network affiliation contracts in general, if any, might render petitioner's contract valueless to petitioner or to CBS and lead to its termination or the time when the event constituting such a cause might occur. Cf. *Burnet* v. *Niagara Falls Brewing Co.*, 282 U.S. 648.[13] In our opinion petitioner has failed to prove facts upon which we could form even a "reasonable approximation" of the useful life of the intangible here in question. Certainly it has failed to prove that the depreciation of the contract "over a period including the then current term and six two-year renewal terms" produces a reasonable allowance for depreciation.

In our opinion the so-called reasonable-certainty rule advocated by the petitioner has no proper application in the computation of the amortization of the intangible asset here involved. It is our further opinion that even if it be assumed *arguendo* that such a rule might properly have application to the amortization problem before us the factual basis for its application has not been proved.

Reviewed by the Court.

*Decision will be entered for the respondent.*

HOYT, *J.*, concurs in the result.

———

DAWSON, *J.*, concurring: On the basis of this record and the theory urged by petitioner, I agree with the conclusion reached in the majority opinion. However, I would like to stress that, if the petitioner in this case had established an estimated useful life of the network affiliation contract with reasonable accuracy by using statistical data and analyses based upon the general experience of the television industry, I would allow a depreciation deduction on a straight-line method. My reasons are fully spelled out in this Court's opinion in *Indiana Broadcasting Corporation*, 41 T.C. 793 (1964). I recognize, of course, that the Court of Appeals for the Seventh Circuit has rejected this view. I believe that if it can be established that an intangible asset will in all probability terminate or exhaust, the courts should more readily accept a reasonable estimate of useful life, derived from com-

———

[13] We point out that unlike such cases as *Northern Natural Gas Co.* v. *O'Malley*, 277 F. 2d 128 (C.A. 8), reversing 174 F. Supp. 176 (D. Neb.) and *Shell Pipe Line Corp.* v. *United States*, 267 F. Supp. 1014 (S.D. Tex.), the period of the usefulness of the intangible in this case cannot be approximated by approximating the period of usefulness of a tangible asset to which it relates, *e.g.*, the approximation of the period of usefulness of pipeline rights by way of approximating the useful life of the gas wells served by the pipelines.

petent statistical formulae, to determine the period over which the cost of the asset can be depreciated. In this connection industry experience may be adequate proof of the "period" of the intangible asset's useful life to a particular taxpayer. Under such circumstances I would discard the unrealistic differentiation often drawn between tangible and intangible assets.

FAY, TANNENWALD, IRWIN, and STERRETT, *JJ.*, agree with this concurring opinion.

---

TANNENWALD, *J.*, concurring: I agree with Judge Dawson's reservations. In addition, I continue to be concerned with the manner in which depreciation and amortization are seemingly used interchangeably in opinions of this Court, of which the majority opinion is an example. While such use does not affect either the rationale or the result in the instant case, there are other situations in which a careful delineation between depreciation and amortization is essential. See my dissenting opinion in *Allen M. Early*, 52 T.C. 560 (1969).