ROY H. PARK BROADCASTING, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

R.H.P., INCORPORATED (SUCCESSOR TO STATE AND AURORA, INC.), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1550–73, 6237–73, 1076–74, 3006–74.     Filed June 21, 1982.

*Jerome B. Libin, George K. Yin,* and *Erik L. Kitchen,* for the petitioners.

*Eric B. Jorgensen,* for the respondent.

STERRETT, *Judge*: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Taxable year ended | Deficiency |
|---|---|---|---|
| 1550–73 | Roy H. Park | | |
| | Broadcasting, Inc. ......... | June 30, 1966 | $10,431.36 |
| | | June 30, 1967 | 78,343.63 |
| 6237–73 | | June 30, 1968 | 173,448.31 |
| 1076–74 | | June 30, 1969 | 15,897.36 |
| | | June 30, 1970 | 19,161.74 |
| | | July 1, 1971 | |
| | | Oct. 31, 1971 | 38,361.06 |
| 3006–74 | R. H. P., Inc. | | |
| | (Successor to | | |
| | State & Aurora, Inc.) ... | Dec. 31, 1966 | 5,521.00 |
| | | Dec. 31, 1967 | 131,926.00 |

After concessions, the issues for decision are (1) whether petitioners are entitled to amortize a portion of their basis in each of four television network affiliation contracts; (2) whether petitioner Roy H. Park Broadcasting, Inc., is collaterally estopped from relitigating the question of whether the television network affiliation contract between CBS and WNCT-TV has an indeterminable useful life;[1] (3) whether petitioners are entitled to amortize their basis in each of five radio network affiliation contracts; and (4) whether petitioner Roy H. Park Broadcasting, Inc., made a timely election pursuant to section 1071, I.R.C. 1954, to treat its sale of 12,285 shares of stock of Atlantic Telecasting Corp. as an involuntary conversion under section 1033.

---

[1]Should we decide the first issue in favor of respondent, we need not decide the second issue.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

Petitioner Roy H. Park Broadcasting, Inc. (hereinafter Greenville), a corporation organized under the laws of the State of North Carolina, had its principal office in Greenville, N.C., at the time of filing each of its petitions herein. R. H. P., Inc. (hereinafter RHP), successor to State & Aurora, Inc., and a corporation organized under the laws of the State of New York, had its principal office in Ithaca, N.Y., at the time of filing its petition herein.

At all times material to this case, Greenville and RHP maintained their books of account and prepared their Federal corporate income tax returns on the basis of the accrual method of accounting and, except where otherwise noted, on the basis of fiscal and taxable years ended June 30, for Greenville, and December 31, for RHP.

For its taxable years ended June 30, 1966, and June 30, 1967, Greenville filed consolidated Federal corporate income tax returns with the District Director of Internal Revenue for the Greensboro District, Greensboro, N.C. For its taxable years ended June 30, 1968, June 30, 1969, June 30, 1970, and June 30, 1971, and its taxable period from July 1, 1971, to October 31, 1971, inclusive, Greenville filed consolidated Federal corporate income tax returns with the Internal Revenue Service Center, Chamblee, Ga.

For its taxable year ended June 30, 1968, Greenville mailed an amended Federal corporate income tax return, Form 1120, to the District Director of Internal Revenue for the Greensboro District, Greensboro, N.C., on August 6, 1969. The amended return was received by the District Director on August 11, 1969. For the same taxable year, Greenville mailed two amended Federal corporate income tax returns, Forms 1120X, to the Internal Revenue Service Center, Memphis, Tenn., on March 30, 1973, and August 14, 1973. Such amended returns were received by the Service Center on April 6, 1973, and August 20, 1973, respectively.

On September 15, 1971, Greenville mailed a Corporation Application for Tentative Refund from Carryback of Net Operating Loss and Unused Investment Credit, Form 1139, to

the Internal Revenue Service Center, Chamblee, Ga. The application, received by the Service Center on September 20, 1971, claimed a net operating loss carryback from its taxable year ended June 30, 1971, to its taxable year ended June 30, 1968, in the amount of $321,841.18. Thereafter, on September 27, 1972, Greenville mailed a Claim, Form 843, to the Internal Revenue Service Center, Chamblee, Ga., claiming a net overpayment in the amount of $95,068.96. The claim was received by the Service Center on October 2, 1972.

For its taxable years ended December 31, 1964 (separate return), December 31, 1965 (separate return), December 31, 1966 (consolidated return), and December 31, 1967 (consolidated return), State & Aurora, Inc., the predecessor to RHP, filed Federal corporate income tax returns with the District Director of Internal Revenue, Buffalo, N.Y.

For its taxable period from June 12, 1964, to June 30, 1964, inclusive, and for its taxable years ended June 30, 1965, and June 30, 1966, Roy H. Park Broadcasting of the Tri-Cities, Inc. (hereinafter Johnson City), a subsidiary of RHP, filed separate Federal corporate income tax returns with the District Director of Internal Revenue, Nashville, Tenn. For the subsequent taxable periods at issue, Johnson City changed its accounting year to a calendar year and, commencing with the short taxable year July 1 to December 31, 1966, joined in the consolidated return filed by State & Aurora, Inc. For its taxable period from July 1, 1965, to December 31, 1965, Roy H. Park Broadcasting of Virginia, Inc. (hereinafter Richmond), a subsidiary of RHP, filed a separate Federal income tax return and a separate amended Federal corporate income tax return with the District Director of Internal Revenue, Richmond, Va. Commencing with its taxable year ended December 31, 1966, Richmond joined in the consolidated return filed by State & Aurora, Inc.

## I. TELEVISION AND RADIO NETWORK AFFILIATION CONTRACTS

### A. BACKGROUND

Greenville was incorporated in North Carolina on April 24,

1961, for the purpose of operating television and broadcasting facilities.[2] Greenville and its subsidiaries own seven television stations, two of which are UHF (ultra high frequency) stations, seven AM radio stations, and seven FM radio stations.[3] The seven television stations and their locations are: WDEF-TV in Chattanooga, Tenn.; WBMG-TV in Birmingham, Ala.; WNCT-TV in Greenville, N.C.; WSLS-TV in Roanoke, Va.; WUTR-TV in Utica, N.Y.; WJHL-TV in Johnson City, Tenn.; and WTVR-TV in Richmond, Va. Five of the television stations have network affiliation contracts with the Columbia Broadcasting System (hereinafter CBS), while one each is affiliated with the American Broadcasting Co. (hereinafter ABC) and the National Broadcasting Co. (hereinafter NBC).

The 14 AM and FM radio stations and their locations are: KEZX-FM in Seattle, Wash.; KWJJ-AM and KJIB-FM in Portland Oreg.; WHEN-AM and WONO-FM in Syracuse, N.Y.; WDEF-AM and WDEF-FM in Chattanooga, Tenn.; WNCT-AM and WNCT-FM in Greenville, N.C.; WTVR-AM and WTVR-FM in Richmond, Va.; KRSI-AM and KFMX-FM (KRIS-FM during the years in issue) in St. Louis Park, Minn.; and WNAX-AM in Yankton, S. Dak. Four of the AM radio stations have network affiliation contracts with CBS-Radio, and the other three are affiliated with ABC-Entertainment. Four of the FM radio stations are network affiliates. The other three are independent.

### 1. Greenville

On March 15, 1962, Greenville acquired all of the issued and outstanding stock of Carolina Broadcasting System, Inc., which owned and operated television station WNCT-TV, a VHF (very high frequency) station located in Greenville, N.C., affiliated with CBS, and serving a television market known as the Greenville-Washington-New Bern market. Carolina Broadcasting System, Inc., was promptly liquidated into Greenville

---

[2]During the years at issue, Roy H. Park, a corporation other than petitioner corporation, owned all of Greenville's issued and outstanding stock.

[3]Pursuant to Federal Communications Commission regulations, these numbers constitute the maximum number of television and radio stations that any entity or individual is allowed to own.

pursuant to sections 332 and 334(b)(2) of the Internal Revenue Code of 1954. Since September 7, 1963, the Greenville-Washington-New Bern market has contained three VHF stations, each affiliated with one of the major television networks, and since May 7, 1972, it also has contained a UHF noncommercial station.

Among the assets acquired by Greenville in its purchase of WNCT-TV was that station's primary network affiliation contract with CBS. Greenville's basis in that contract as of the date of acquisition was $434,640.[4]

Greenville has four wholly owned subsidiaries: Roy H. Park Radio, Inc. (hereinafter Radio, Inc.); Roy H. Park Broadcasting of the Midwest, Inc. (hereinafter Midwest); Roy H. Park Broadcasting of Roanoke, Inc. (hereinafter Roanoke); and Roy H. Park Broadcasting of Utica-Rome, Inc. (hereinafter Utica-Rome).

### a. Radio, Inc.

Radio, Inc., was incorporated in North Carolina on March 15, 1963, and has its principal office in Greenville, N.C. In August 1963, it acquired radio station WNCT-AM of Greenville, N.C., from A. W. Lewin for $116,885.06. One of the assets purchased by Radio, Inc., in the acquisition of WNCT-AM was a radio network affiliation contract with CBS-Radio.[5] Radio, Inc.'s basis in such contract as of August 1963 was zero.[6]

### b. Midwest

Midwest was incorporated in Minnesota on May 7, 1968, with offices in Duluth, Minn.; St. Louis Park, Minn.; and Yankton, S. Dak. In December 1968, Midwest acquired radio stations WEBC-AM of Duluth, KRSI-AM and KRSI-FM of St. Louis Park, and WNAX-AM of Yankton from Area-wide Communications for $2,900,000. Among the assets acquired by

---

[4]Such amount was determined by this Court in *Roy H. Park Broadcasting, Inc. v. Commissioner*, 56 T.C. 784 (1971).

[5]WNCT-AM, which began operation in 1940, had been affiliated with CBS-Radio since 1962.

[6]On Dec. 22, 1963, Greenville (not Radio, Inc.) began operating radio station WNCT-FM, serving the Greenville, N.C., area. The station is not affiliated with any radio network.

Midwest were the existing radio network affiliation contracts of each station.

At the date of acquisition, WEBC-AM had an affiliation contract with ABC's American Contemporary Radio Network, KRSI-AM and KRSI-FM had a joint affiliation contract with ABC-Radio, and WNAX-AM had an affiliation contract with the CBS radio network. Midwest's combined basis in such contracts at the time of purchase was $156,000. Since their acquisition by Midwest, all of the stations have maintained the same affiliations except for KRSI-AM and KRSI-FM, which have been affiliated with ABC's American Entertainment Radio Network since July 1969.

## c. Roanoke

Roanoke was incorporated in Virginia on April 23, 1969, with its principal office in Roanoke, Va. In September 1969, it acquired television station WSLS-TV, a VHF station serving the Roanoke-Lynchburg, Va., market, and radio stations WSLS-AM and WSLS-FM from the Shenandoah Life Insurance Co. for $7,160,072. The two radio stations were sold by Roanoke in July 1972.

One of the assets acquired by Roanoke in its acquisition of WSLS-TV was that station's television network affiliation contract with NBC. Roanoke's basis in the affiliation contract as of the date of purchase was $2,097,471. Since Roanoke's acquisition of WSLS-TV, the Roanoke-Lynchburg market has contained three VHF stations, each affiliated with one of the major television networks, and two UHF stations, one commercial and one noncommercial. In 1975, the UHF commercial station ceased operations.

One of the assets that Roanoke acquired in its purchase of WSLS-AM was that station's radio network affiliation contract with NBC. Roanoke's basis in the contract at that time was $15,000. WSLS-AM maintained its affiliation with NBC throughout Roanoke's 3-year period of ownership.

## d. Utica-Rome

Utica-Rome was incorporated in New York on May 7, 1969, and has its principal office in Utica, N.Y. Thereafter, it formed UHF television station WUTR-TV of Utica, which began operation on February 28, 1970. Since that time, WUTR-TV

has had a television network affiliation contract with ABC. Utica-Rome's basis in such contract is zero.

## 2. RHP

State & Aurora, Inc., the predecessor of RHP, was incorporated in New York on February 1, 1952, with its principal office in Ithaca, N.Y. On August 1, 1972, its name was changed to R. H. P., Inc. It did not own any television or radio station broadcast properties directly, but through its wholly owned subsidiaries, Roy H. Park Broadcasting of the Tri-Cities, Inc. (hereinafter Johnson City), and Roy H. Park Broadcasting of Virginia, Inc. (hereinafter Richmond), it owned two television stations and two radio stations.

### a. Johnson City

Johnson City was incorporated in Tennessee on January 6, 1964, with its principal office in Johnson City, Tenn. On June 12, 1964, it acquired, for $2,500,000, all of the outstanding stock of WJHL, Inc., which owned and operated WJHL-TV, a VHF television station serving the Johnson City (Tenn.) - Kingsport (Tenn.) - Bristol (Va.) television market. WJHL, Inc., was immediately liquidated into Johnson City pursuant to sections 332 and 334(b)(2). Among the assets acquired by Johnson City in its acquisition of WJHL-TV were that station's "primary" network affiliation contract with CBS and its "secondary" network affiliation contract with ABC. At that time, RHP's basis in the CBS contract was $624,500 and its basis in the ABC contract was $176,200.

At the time of Johnson City's acquisition of WJHL-TV, there were only two VHF stations in the Johnson City-Kingsport-Bristol market. In August 1969, when UHF station WKPT-TV began operation, WJHL-TV lost its secondary affiliation contract with ABC to the new station.[7]

### b. Richmond

Richmond was incorporated in Virginia on November 20,

---

[7]As of Dec. 31, 1965, due to the unstable nature of the Johnson City market, it was reasonable to expect that a third television station would begin operation in the market within the next 5 years and that, consequently, the ABC network affiliation agreement with WJHL-TV would be terminated. Actual events bore out this expectation.

1964, with its principal office in Richmond, Va. On November 15, 1965, it purchased all of the issued and outstanding stock of Havens & Martin, Inc., which owned and operated television station WTVR-TV and radio stations WTVR-AM and WTVR-FM in Richmond, Va., and Richmond Broadcasting Co., Inc., for a total consideration of $8,618,352. The companies were immediately liquidated into Richmond pursuant to sections 332 and 334(b)(2).

One of the assets acquired by Richmond in the purchase was the television network affiliation contract of WTVR-TV with CBS. Richmond's basis in the contract as of the date of acquisition was $2,207,851. WTVR-TV is a VHF television station serving the Richmond-Peterson, Va., market. From the time of Richmond's acquisition of WTVR-TV through the years at issue, such market contained three VHF television stations, each affiliated with one of the major television networks, as well as one noncommercial UHF station, and, after 1966, an additional noncommercial UHF station.[8]

Another of the assets acquired by Richmond was the radio network affiliation contract of WTVR-AM with ABC. Richmond's basis in such contract as of the date of acquisition was $15,000. In September 1971, WTVR-AM's affiliation with ABC, which originally began in October 1956, was terminated, and WTVR-AM became affiliated with CBS.

Since September 1968, WTVR-FM has had a radio network affiliation contract with ABC-American FM Radio Network.

### B. NATURE OF THE TELEVISION BROADCASTING INDUSTRY AND AFFILIATION CONTRACTS

### 1. The Industry

Television broadcasting stations operate on channels assigned by the Federal Communications Commission (FCC). There are 12 VHF channels, numbered 2 through 13, and 70 UHF channels, numbered 14 through 83. Varying numbers of channels are allocated to particular market areas by the FCC, and each allocated channel may be assigned to a particular applicant by the granting of a construction permit, and, upon

---

[8]Since 1973, there has been a fourth VHF television station in the Richmond-Peterson market.

completion of construction and demonstration of compliance with FCC technical requirements, by the granting of a license.[9] The FCC license is a permit without which any broadcast activity is prohibited.

## 2. Affiliation Contracts

Affiliation relationships between networks and individual stations predominate in the industry, to the mutual advantage of both network and station.[10] Television networks receive the benefit of increased circulation of network programing, thereby increasing the amount of money that they can charge their advertisers for the sale of commercial time.[11]

In turn, affiliated stations receive a number of benefits. One such benefit is derived from the free programing provided by the network during approximately 70 percent of a station's normal broadcasting hours. The gratuitous provision of network programing saves affiliated stations substantial costs that would otherwise be incurred by them in the production or purchase of their own programing.

The network also provides the station with advertising time (usually 2 to 4 minutes per hour) within or adjacent to the free network programing that the station can sell to national, regional, and local advertisers of the station's choosing. The station normally can sell these "adjacencies" or "spots" at significantly higher rates than those charged for advertising time contained in non-network or local programing since network programing is often far superior in quality to non-network or local programing. Such superior quality attracts a larger viewing audience which, in turn, increases the value of

---

[9]Where more than one applicant files for a single television assignment, the FCC is required by law to hold a formal proceeding to select the best-qualified applicant. The assignment of an existing television license, however, though subject to FCC approval, does not require such a hearing. A qualified transferee of a television station reasonably can expect to obtain FCC approval.

[10]Although we take the liberty of employing the present tense in describing the network affiliation arrangement in the ensuing pages, it should be understood that the conditions described, unless otherwise specifically noted, existed during the years in issue.

[11]There are currently three national commercial television networks: Columbia Broadcasting System (CBS), National Broadcasting Co. (NBC), and American Broadcasting Co. (ABC).

the accompanying advertising time that is supplied to the station.[12] However, because in the case of non-network programing the station has the use of all available advertising time, such programing *may* yield higher average gross revenue to the station than does the advertising time provided by the network, notwithstanding the fact that a higher rate can be charged by the station for advertising time provided during network programing.[13] In other words, the greater quantity of advertising time available during non-network programing is sometimes sufficient to offset the relatively lower rate than can be charged during such time.

During the years at issue, the value of affiliation to the local station lay to a large extent in the income produced under the revenue-sharing component of the affiliation contract (hereinafter network revenue). Under such agreement, the network compensates the station for the broadcasting of network programing by sharing a portion (approximately 30 percent) of its attributable advertising revenues from the sale of advertising time (usually 5 to $7\frac{1}{2}$ minutes per hour) during its network programing. The station's percentage is called the network card rate.

An incidental benefit of affiliation is "audience flow," that is, the tendency of audiences of network programs to carry over into non-network programing on the same channel. The network programing's "capture" of this audience enables the local station to sell the advertising time associated with surrounding non-network programing at a higher rate than it otherwise could. The network also provides promotions for network programs through a nationwide series of advertisements.

Another indirect benefit of affiliation is derived from the enhancement in station value resulting from affiliated status. As a general rule, affiliated stations are sold for a larger sum

---

[12]Traditionally, network programs have had the highest viewing levels during the prime evening hours from 7:30 p.m. to 11 p.m. (now 8 to 11 p.m.) when potential audiences are greatest, advertisers' interest the keenest, and time rates the highest. Prime time audience and advertising have been dominated largely by network affiliated stations.

[13]Of course, programing costs, otherwise not incurred by the stations in the case of network programing, cut into advertising revenues received during non-network programing.

than their unaffiliated counterparts. To a lesser degree of importance is the network practice of occasionally purchasing an affiliated station's coverage of a local event for network broadcasting.

Although affiliation contracts are individually negotiated, they generally conform to a standard form used by each network. Such contracts typically run for a renewable period of 2 years and, as described above, the network agrees to provide free programing to the station, to offer the station first call for network programs, and to pay the station a negotiated percentage of the station's network card rate for all network programs broadcast by the local station.

As indicated above, approximately 70 percent of an affiliate's total programing is furnished to it by the network without charge, except for some very minor costs. The affiliate is not obligated to broadcast network programs. However, the failure to clear an adequate number of hours for network programs is looked upon with disfavor by networks and could lead to termination of the affiliation upon expiration of the 2-year contract.

The affiliated station generally has two program sources in addition to network programing. One source is programing produced by the station itself. Examples include locally produced news reports, sports shows, discussion groups, and films. The other source is programs acquired by the station. This category is called "syndicated programing," and consists of programs previously shown on a network, original national programing, movies, and other nonlocal programs. Unlike the free programing provided by the networks, both sources involve substantial costs to the station.

Commercial television derives its income from advertisers, who purchase time and other services of television stations for the presentation of commercial messages to the public. While television is both an entertainment and an advertising medium, its income is attributable exclusively to the latter function since programs are provided free of charge to the public. As an advertising medium, the value of commercial television and the resulting advertising rate are measured by the size and demographics of the audience, which, in turn, are determined

by the number of homes capable of receiving the television signal and by the ability of programs to attract viewers.[14]

Television programing always has been very expensive to produce. As a result, television is an economical and effective advertising medium only if it is capable of attracting large audiences. Network programs, because they are marketed across the nation through their affiliates, characteristically have greater circulation than locally produced shows and therefore generate greater advertising revenues. This, in turn, permits the networks to spend greater amounts in the production of programing than the local stations, and, consequently, to produce programing of generally superior quality.

Advertising can be divided into three broad categories: network advertising, national spot advertising, and local spot advertising. Network advertising refers to the sale by the network of advertising time during network programing. Network revenues received by the local station consist of that station's share (usually 30 percent) of network advertising paid by the advertiser for circulation by the affiliated station. Spot advertising refers to the direct sale by a local station either of advertising time during non-network programs, or, in the case of network programing, of that portion of advertising time which remains available for use by the local station after network advertising has been provided.

The station retains the full proceeds (net of commissions) of national, regional, or local advertising. However, the sale of national or regional advertising generally involves the intervention of various advertising representatives who are compensated on a commission basis. For national advertising, the total commission rate is approximately 30 percent, while that of regional advertising is approximately 25 percent. In the case of local sales, typical sales costs of 10 percent and production costs of 15 percent add up to a cost of approximately 25 percent.

Television advertising takes various forms. An advertiser may present a program, together with commercial messages, on time purchased from the station. Alternatively, an advertis-

---

[14]While audience rating is somewhat affected by the technical quality of transmission, as well as by various managerial factors such as program continuity and promotion, by far its most crucial determinant is the quality of individual programs.

er may purchase participating announcements which are interspersed throughout a single program. An advertiser may also purchase an "adjacency"[15] generally of 10, 20, 30, or 60 seconds' duration, for presentation during the time interval between programs, or sometimes within programs.

The National Association of Broadcasters Television Code provides for 9½ minutes of commercial time during an hour of network program time. Depending on the terms of the network affiliation contract, a station could have anywhere from 2 to 4 minutes of the 9½ minutes of commercial time to sell as its advertising time. By contrast, the National Association of Broadcasters Television Code permits 12 minutes of commercial time during an hour of non-network programing. These spots are, of course, sold by the station. The value of the spot once again depends upon the size of the audience.

The affiliation relationship is of great value to the affiliate, particularly in a small market where the local station, in competition with other affiliated stations, otherwise would find it difficult to survive. The station is furnished with quality programs with which locally produced programs often cannot compete.

Network affiliations are bestowed upon the chosen station without charge for the simple reason that an affiliation agreement is advantageous to the networks since it adds a market outlet. Indeed, where there are more networks than stations in a market, networks will compete with one another for affiliation. In the reverse situation, it is the local stations that vie for affiliation. In balanced markets, where an equal number of networks and stations are present, this rivalry is reduced to the question of which station will combine with which network; almost invariably, all stations and networks eventually become affiliated.

In selecting television affiliates, where such choice is available, the networks consider a number of factors, including the station's management, personnel, and reputation in the community, the existence of a satisfactory relationship between a station's owners and operators, and the broadcaster's experience and history in the broadcasting field. Networks also are

---

[15]An "adjacency" is a time segment retained by the station and sold directly to advertisers.

influenced by the number of stations controlled by the same owner. The bond between such a "group owner" and the network is fortified by the potentially harmful ramifications that might result from withdrawal of affiliation in one market.

A television station can have affiliation agreements with more than one network. Where this is the case, one of the affiliations is generally known as a "primary" affiliation and the other as a "secondary" affiliation. Under a primary affiliation, the affiliate agrees to carry a substantial portion of the programs produced by the network. Under a secondary affiliation, the affiliate undertakes no such obligation. Therefore, as a rule, the affiliate's broadcasting of primary network programs exceeds that of the secondary network.

Secondary affiliations generally are prevalent in markets in which there are more networks than stations. Although less desirable to the network than a primary affiliation, they are nevertheless entered into by networks in order to maximize distribution of its programing. A secondary affiliation is valuable to a television station in a variety of ways. First, it permits the station to choose among a larger selection of programs so as to satisfy the largest possible audience. A larger audience, in turn, generates larger advertising revenues. It also permits a station to schedule its strongest programs for the early evening hours in order to take advantage of "audience flow." Second, it improves the station's bargaining position with respect to the network rates due to the fact that several networks compete for the affiliates' time (the so-called leverage factor). Lastly, the network, desirous of having its programs broadcast, frequently allows the showing of its programs in nonprime hours while compensating the station at prime rates. Thus, despite the existence of a primary affiliation, a secondary affiliation is of definite value to the station.

### 3. Network Revenue

During the early 1960's and through the years at issue, network revenue constituted a significant portion of the total revenue of local stations similar to those in the instant case.[16]

---

[16]These results for the most part are based on a study of network revenue as a percentage

Over this period, network revenue as a general rule rose slowly and steadily.[17] Net non-network revenue also increased during this time. By the late 1960's, non-network revenue increased at a faster pace than network revenue, so that, as a result, the percentage of network revenue to total revenue generally began to decline after having risen during the late fifties and after having remained fairly steady during the early sixties.

An analysis of the individual Park stations involved in this case also demonstrates the downward trend in network revenue over total station revenue since the late 1960's. However, total network revenue generally continued to climb over this period and throughout the 1970's (except for the early 1970's, when the cigarette advertising ban took effect). The following charts illustrate these points:

### GREENVILLE - WNCT-TV

| Year[1] | Total network revenues[2] | Total gross broadcast revenues[3] | Percent network revenues to total revenues | Program expense |
|---|---|---|---|---|
| 1954 | $58,561 | $517,030 | 11.3 | $166,666 |
| 1955 | 87,324 | 723,190 | 12.1 | 237,462 |
| 1956 | 151,300 | 786,504 | 19.2 | 230,326 |
| 1957 | 196,406 | 874,749 | 22.4˙ | 265,255 |
| 1958 | No FCC Form 324 available | | | |
| 1059 | 245,807 | 891,372 | 27.6 | 226,287 |
| 1960 | No FCC Form 324 available | | | |
| 1961 | 316,197 | 1,060,076 | 29.8 | 217,904 |
| 1/1/62—3/15/62 | 59,507 | 217,968 | 27.3 | 47,920 |
| 3/16/62—12/31/62 | 283,640 | 985,820 | 28.8 | 213,644 |
| 1963 | 362,144 | 1,327,190 | 27.3 | 313,379 |
| 1964 | 338,939 | 1,308,634 | 25.9 | 212,502 |
| 1965 | 340,002 | 1,397,201 | 24.3 | 223,358 |
| 1966 | 339,565 | 1,469,877 | 23.1 | 238,651 |

of net broadcast revenue after commissions for 32 television markets that were ranked between 50 and 110 in size in 1970, including all 4 of the markets of the television stations involved in this case. The source for the data is the annual TV Factbooks.

[17]There was a notable decrease around 1971 when the FCC banned cigarette advertising on television.

| 1967 | $ 329,254 | $ 1,409,348 | 23.4 | $ 334,504 |
|------|-----------|-------------|------|-----------|
| 1968 | 308,160 | 1,603,806 | 19.2 | 362,261 |
| 1069 | 333,263 | 1,847,517 | 18.0 | 358,623 |
| 1970 | 322,188 | 2,050,267 | 15.7 | 452,406 |
| 1971 | 356,652 | 2,272,364 | 15.7 | 471,809 |
| 1972 | 265,363 | 2,393,795 | 11.1 | 433,218 |
| 1973 | 278,261 | 2,342,834 | 11.9 | 496,890 |
| 1974 | 299,069 | 2,606,430 | 11.5 | 517,643 |
| 1975 | No FCC Form 324 available | | | |
| 1976 | No FCC Form 324 available | | | |
| 1977 | 354,716 | 3,429,769 | 10.3 | 676,063 |
| 1978 | 426,467 | 3,495,155 | 12.2 | 738,253 |
| 1979 | 425,987 | 4,439,869 | 9.6 | 857,934 |

[1]Calendar year, unless otherwise specified.
[2]Sale of station time to major networks (ABC, CBS, NBC).
[3]Including network, non-network, and incidental broadcast revenues.

ROANOKE - WSLS-TV

| Year[1] | Total network revenues[2] | Total gross broadcast revenues[3] | Percent network revenues to total revenues | Program expense |
|---------|---------------------------|-----------------------------------|--------------------------------------------|-----------------|
| 1964 | No FCC Form 324 available | | | |
| 1965 | No FCC Form 324 available | | | |
| 1966 | No FCC Form 324 available | | | |
| 1967 | No FCC Form 324 available | | | |
| 1968 | No FCC Form 324 available | | | |
| 1/1/69— 10/14/69 | No FCC Form 324 available | | | |
| 10/15/69— 12/31/69 | $87,281 | $482,470 | 18.1 | $112,102 |
| 1970 | 466,396 | 2,119,089 | 22.0 | 515,026 |
| 1971 | 448,049 | 2,235,882 | 20.0 | 539,105 |
| 1972 | 414,457 | 2,991,549 | 13.9 | 548,810 |
| 1973 | 413,359 | 2,530,412 | 16.3 | 572,051 |
| 1974 | 445,446 | 2,604,353 | 17.1 | 581,961 |
| 1975 | 438,781 | 2,684,805 | 16.3 | 603,626 |
| 1976 | 480,586 | 3,414,612 | 14.1 | 689,382 |
| 1977 | 632,932 | 3,630,728 | 17.4 | 622,798 |
| 1978 | 623,805 | 4,017,553 | 15.5 | 733,140 |
| 1979 | 839,695 | 4,622,771 | 18.2 | 895,092 |

[1]Calendar year, unless otherwise specified.
[2]Sale of station time to major networks (ABC, CBS, NBC).
[3]Including network, non-network, and incidental broadcast revenues.

## Johnson City - WJHL-TV

| Year[1] | Total network revenues[2] | Total gross broadcast revenues[3] | Percent network revenues to total revenues | Program expense |
|---|---|---|---|---|
| 10/26/53—12/31/53 | $4,858 | $31,204 | 15.5 | $9,521 |
| 1954 | 42,645 | 320,457 | 13.3 | 105,889 |
| 1955 | 95,936 | 471,204 | 20.4 | 110,933 |
| 1956 | 134,469 | 582,489 | 23.1 | 95,032 |
| 1957 | 148,703 | 509,692 | 29.2 | 92,523 |
| 1958 | 161,686 | 531,372 | 30.4 | 88,875 |
| 1959 | 178,305 | 571,673 | 31.2 | 99,137 |
| 1960 | 200,592 | 574,229 | 34.9 | 104,428 |
| 1061 | 210,234 | 600,981 | 35.0 | 102,895 |
| 1962 | 258,371 | 742,761 | 34.8 | 106,922 |
| 1963 | 270,282 | 791,551 | 34.1 | 110,277 |
| 1/1/64—6/12/64 | 136,454 | 426,307 | 32.0 | 54,698 |
| 6/13/64—12/31/64 | 161,973 | 532,136 | 30.4 | 68,038 |
| 1065 | 302,603 | 937,028 | 32.3 | 171,964 |
| 1966 | 293,148 | 1,005,574 | 29.1 | 230,794 |
| 1967 | 294,683 | 972,637 | 30.3 | 205,215 |
| 1968 | 314,123 | 1,149,155 | 27,3 | 224,665 |
| 1969 | 325,848 | 1,230,345 | 26.5 | 229,550 |
| 1970 | 275,843 | 1,234,351 | 22.3 | 255,981 |
| 1971 | 273,903 | 1,227,389 | 22.3 | 264,165 |
| 1972 | 252,229 | 1,373,516 | 18.4 | 294,158 |
| 1973 | 252,806 | 1,493,728 | 16.9 | 290,927 |
| 1974 | 267,487 | 1,633,425 | 16.4 | 309,073 |
| 1975 | 278,893 | 1,656,580 | 16.8 | 367.952 |
| 1976 | 306,285 | 2,199,033 | 13.9 | 413,286 |
| 1977 | 346,744 | 2,409,611 | 14.4 | 384,599 |
| 1978 | 404,664 | 3,192,679 | 12.7 | 450,474 |
| 1979 | 408,278 | 3,412,964 | 11.9 | 589,974 |

[1]Calendar year, unless otherwise specified.
[2]Sale of station time to major networks (ABC, CBS, NBC).
[3]Including network, non-network, and incidental broadcast revenues.

RICHMOND - WTVR-TV

| Year[1] | Total network revenues[2] | Total gross broadcast revenues[3] | Percent network revenues to total revenues | Program expense |
|---|---|---|---|---|
| 1962 | $438,914 | $1,632,956 | 26.9 | $241,910 |
| 1963 | No FCC Form 324 available | | | |
| 1964 | 438,899 | 1,741,513 | 25.2 | 253,116 |
| 1/1/65— 11/15/65 | 376,484 | 1,682,327 | 22.4 | 233,672 |
| 11/16/65— 12/31/65 | 58,368 | 229,955 | 25.3 | 29,691 |
| 1966 | 440,077 | 2,071,656 | 21.2 | 322,492 |
| 1967 | 421,572 | 2,204,557 | 19.1 | 289,547 |
| 1968 | 453,486 | 2,601,540 | 17.4 | 407,333 |
| 1969 | 497,246 | 3,014,518 | 16.4 | 480,563 |
| 1970 | 475,189 | 2,980,414 | 15.9 | 512,672 |
| 1971 | 478,457 | 2,983,881 | 16.0 | 567,643 |
| 1972 | No FCC Form 324 available | | | |
| 1973 | 545,998 | 3,777,758 | 14.4 | 691,581 |
| 1974 | 564,295 | 4,058,130 | 13.9 | 776,251 |
| 1975 | 484,742 | 4,219,990 | 11.5 | 859,642 |
| 1976 | 517,493 | 5,075,512 | 10.2 | 902,630 |
| 1977 | 553,130 | 5,575,516 | 9.9 | 975,191 |
| 1978 | 626,870 | 6,449,156 | 9.7 | 966,863 |
| 1979 | 644,583 | 6,868,316 | 9.4 | 1,239,813 |

[1]Calendar year, unless otherwise specified.
[2]Sale of station time to major networks (ABC, CBS, NBC).
[3]Including network, non-network, and incidental broadcast revenues.

## II. NATURE OF THE RADIO BROADCASTING INDUSTRY AND AFFILIATION CONTRACTS

### A. THE INDUSTRY

In the 1930's and the early 1940's, the four major radio networks, CBS, NBC "red," NBC "blue" (later ABC), and Mutual dominated radio broadcasting just as the three major networks dominate television today. At that time, 733 of the approximately 900 radio stations in operation were affiliated with the major networks. After World War II, the FCC authorized a large number of new radio stations. Consequently, from 1946 through 1950, approximately 1,300 new stations came on the air. In 1972, there were 8,253 total broadcasting

stations, of which 4,381 were commercial AM stations, 2,401 were commercial FM stations, and 549 were noncommercial FM stations.[18]

The advent of television in the late 1940's and early 1950's brought major changes to the radio industry. As entertainment programs and entertainment-seeking audiences shifted media, radio networks stopped providing full-content programing and instead became providers of news and information services for local stations. Thus, because of television, radio broadcasting became more of an information medium than an entertainment medium. As a result, radio affiliates began experiencing a reduction or termination of network revenue from the radio networks for broadcasting network programing.

The changes in the radio industry have decreased significantly the value of radio affiliation contracts and have affected the basic stability of the network-affiliate relationship. Radio networks continue to serve an important function for their affiliates, and networks still seek out the strongest affiliates, in terms of audience circulation, in a particular market area. However, the key difference between radio affiliation contracts and television affiliation contracts is that, since at least the mid–1950's, radio contracts have been terminated with greater frequency.

### B. RADIO AFFILIATION CONTRACTS

Radio network affiliation contracts generally are for a 2-year period and renew automatically. They may be canceled on 6-months written notice by the network, or on 90-days written notice by the station.[19]

A radio network affiliation is not as important to a radio station as a television network affiliation is to a television station. This is because the costs incurred by a typical radio station in creating its own programing are dramatically less

---

[18]Before a radio station legally can broadcast, it must obtain a license from the FCC. Licenses are for 3-year periods and are renewable. The license establishes, among other things, where the station can broadcast, its broadcasting power, and its broadcasting frequency. The frequency determines whether the radio station will be an AM or an FM station.

[19]The network has the right to terminate an affiliation if the affiliated station is sold or engages in conduct deemed improper by the FCC.

than those incurred by a television station. Most radio station programing consists of the broadcasting of various types of music through the use of records. Such records usually can be obtained free of charge from a record manufacturer.

One of the major reasons that a radio station would want to be affiliated with a major radio network is to obtain national news and information programs from the network. Otherwise, it would have to incur substantial costs to produce its own.

The basic news and information service provided by each of the major radio networks is geared to a certain format. Therefore, one of the major considerations of a radio station in choosing a network with which to affiliate is whether that network's format is compatible with that of the radio station.[20]

In order to compete profitably with other radio stations in its market, a radio station may have to change its format. If it is affiliated with a network, this may require a change in affiliation since the network's format may not be compatible with the new station format. Because of this, it is more likely that a radio station will terminate a radio network affiliation contract than, conversely, a radio network will so terminate.[21]

In determining what radio station with which to affiliate, a major radio network looks at the station's listenership. It also considers the station's management and broadcasting facilities. An additional factor is the station's broadcasting market and whether the network has any affiliated stations already broadcasting in the market.[22]

Most of a radio station's revenue comes from the sale of commercials or advertising time during its programing. A radio station sells such time to national, regional, and local advertisers. At the national level, the station normally will use

---

[20]In 1968, ABC Radio, in order to create more diversity, established four networks, ABC Contemporary Radio Network, ABC Information Radio Network, ABC Entertainment Radio Network, and ABC American FM Radio Network, each with a different format. In 1975 or 1976, NBC Radio started its second network, known as NBC News and Information Radio Network. It failed shortly thereafter.

[21]A radio network affiliation contract is similar to a television network affiliation contract in that it provides for the amount of compensation, if any, that a station is to receive for broadcasting the network's programs, it covers the program schedule that the station is to broadcast, and it also provides how the contract will be terminated.

[22]It is uneconomical for a network to duplicate coverage in a given market.

a national advertising representative. The sales staff of the radio station generally will sell advertising at the local and regional levels. A radio station usually is able to sell its advertising time and make a profit without being affiliated with a major radio network.

The main source of revenue for a major radio network[23] is from selling commercial time to national advertisers during the programing it provides to its affiliated stations. Thus, one of the principal functions of the major radio networks is to act as a national advertising network, permitting a national advertiser to buy time from the major radio network during the network's programs and thereby have its commercials broadcast on all the network's affiliated stations throughout the country.

On its Federal corporate income tax returns for its taxable years ended June 30, 1966, and June 30, 1967, Greenville claimed deductions for amortization of its television network affiliation contract between CBS and television station WNCT-TV of Greenville in the amounts of $21,732 and $21,732, respectively. These deductions were disallowed by respondent by notice of deficiency dated December 6, 1972.

On its Federal corporate income tax return for its taxable year ended June 30, 1968, Greenville claimed a deduction for amortization of its television network affiliation contract between CBS and WNCT-TV in the amount of $29,382, which respondent disallowed by notice of deficiency dated May 18, 1973.

On its consolidated Federal corporate income tax returns for its taxable years ended June 30, 1969, June 30, 1970, June 30, 1971, and its taxable period from July 1, 1971, to October 31, 1971, inclusive, Greenville claimed deductions for amortization of its television network affiliation contract between CBS and WNCT-TV in the amounts of $29,382, $29,382, $29,382, and $9,794, respectively. The deductions were disallowed by respondent by notice of deficiency dated November 16, 1973.

On its consolidated Federal corporate income tax returns for its taxable years ended June 30, 1970, June 30, 1971, and its

---

[23]Numerous national and regional radio networks and nonadvertising radio networks, such as Associated Press Radio and United Press Audit National Radio Network, compete with the four major radio networks by providing world and national news programs.

taxable period from July 1, 1971, to October 31, 1971, Greenville claimed deductions in the amounts of $115,102.32, $162,497.28, and $54,165.76, respectively, for amortization of the television network affiliation contract between NBC and television station WSLS-TV of Roanoke, Va., and the radio network affiliation contract between NBC and radio station WSLS-AM of Roanoke, Va. Respondent disallowed the deductions by notice of deficiency dated November 16, 1973.

On its consolidated Federal corporate income tax returns for its taxable years ended June 30, 1970, June 30, 1971, and the taxable period from July 1, 1971, to October 31, 1971, Greenville claimed deductions in the amounts of $368, $1,020.31, and $248.26, respectively, for amortization of the television network affiliation contract between ABC and television station WUTR-TV of Utica, N.Y. Respondent disallowed the deductions by notice of deficiency dated November 16, 1973.

On its consolidated Federal corporate income tax returns for its taxable years ended June 30, 1970, June 30, 1971, and its taxable period from July 1, 1971, to October 31, 1971, Greenville claimed deductions in the amounts of $15,000, $15,000, and $5,000, respectively, for amortization of the radio network affiliation contracts between ABC American Contemporary Radio Network and radio station WEBC-AM of Duluth, Minn.; between ABC Radio and KRSI-AM and KRSI-FM of St. Louis Park, Minn.; and between CBS Radio and WNAX-AM of Yankton, S. Dak. Respondent disallowed these claimed deductions by notice of deficiency dated November 16, 1973.

The amortization deductions for the various television network affiliation contracts and the various radio network affiliation contracts claimed by Greenville on its consolidated Federal corporate income tax return for its taxable year ended June 30, 1971, are at issue in docket No. 6237–73 because of a net operating loss carryback from the taxable year ended June 30, 1971, to its taxable year ended June 30, 1968, in the amount of $321,841.18, which respondent disallowed.[24]

On its Federal corporate income tax returns for its taxable period from June 12, 1964, to June 30, 1964, inclusive, and for

---

[24]Respondent indicated on brief that $12,134.52 of this amount had been allowed.

its taxable years ended June 30, 1965, and June 30, 1966, Johnson City claimed deductions for amortization of the television network affiliation contracts between ABC and television station WJHL-TV of Johnson City, Tenn., and between CBS and WJHL-TV, in the amounts of $2,040.48, $48,860.98, and $48,942.12, respectively, which respondent disallowed in a notice of deficiency issued January 31, 1974, to State & Aurora, Inc., now RHP.[25] The claimed amounts represent either part of the net operating loss of State & Aurora, Inc., for its taxable years ended December 31, 1964, and December 31, 1965, carried forward to its taxable years ended December 31, 1966, and December 31, 1967, or a deduction in determining consolidated net income for State & Aurora, Inc.'s taxable year ended December 31, 1966, and which are at issue in docket No. 3006–74.

On its consolidated Federal corporate income tax returns for its taxable years ended December 31, 1966, and December 31, 1967, State & Aurora, Inc., now RHP, claimed deductions in the amounts of $24,471 and $48,945, respectively, for amortization of its television network affiliation contracts between CBS and WJHL-TV and between ABC and WJHL-TV. Respondent disallowed these deductions by notice of deficiency dated January 31, 1974. These disputed deductions are in addition to the amortization deductions claimed by Johnson City as previously mentioned.

On its Federal corporate income tax return for its taxable period from July 1, 1965, to December 31, 1965, Richmond, a subsidiary of RHP, claimed a deduction in the amount of $19,174.43 for amortization of the television network affiliation contract between CBS and television station WTVR-TV of Richmond, Va., and the radio network affiliation contract between ABC Entertainment Radio Network and radio station WTVR-AM of Richmond, Va. By notice of deficiency dated January 31, 1974, respondent disallowed these deductions as part of the net operating loss of State & Aurora, Inc., now RHP, for its taxable year ended December 31, 1965, carried

---

[25]The CBS contract was Johnson City's "primary" network affiliation contract. The amortization of Johnson City's "secondary" network affiliation contract with ABC is no longer at issue in this case, having been conceded by respondent.

forward to its taxable years ended December 31, 1966, and December 31, 1967.

On its consolidated Federal corporate income tax returns for its taxable years ended December 31, 1966, and December 31, 1967, State & Aurora, Inc., now RHP, claimed deductions in the amount of $152,748 and $152,736, respectively, for amortization of the television network affiliation contract between CBS and WTVR-TV and the radio network affiliation contract between ABC and WTVR-AM. Respondent disallowed these deductions by notice of deficiency dated January 31, 1974.

Prior to trial, respondent conceded that RHP, Inc., is entitled to amortize its basis in the amount of $176,200 in its secondary television network affiliation contract between ABC and WJHL-TV over a 5-year period, the length of its predictable useful life, beginning with its taxable period from June 12, 1964, to June 30, 1964, inclusive.

### III. SECTION 1071 ISSUE

Among the assets acquired by Greenville on March 15, 1962, from Carolina Broadcasting System, Inc., was 30 percent or 12,285 shares of the issued and outstanding stock of Atlantic Telecasting Corp., Inc. (hereinafter Atlantic), owner and operator of television station WECT-TV in Wilmington, N.C. Atlantic also owned 95.06 percent of South Carolina Bottling Co., which in turn owned various Pepsi-Cola bottling subsidiaries.

Roy H. Park was vice president of Atlantic Telecasting Corp. from March 15, 1962, to September 25, 1964. He also served as director from March 15, 1962, to February 6, 1968. T. B. Maxfield, Park's accountant, served as a director from March 15, 1962, to November 1, 1964, at which time Mr. Park's wife, Dorothy D. Park, replaced him and served as a director until February 6, 1968. At the time of the acquisition, there was a "Grade B overlap" between WNCT-TV in Greenville and WECT-TV in Wilmington. However, such overlap was permissible under the multiple ownership rules then in effect.[26]

On December 11, 1964, Atlantic filed an application with the

---

[26]In 1964, the FCC amended the multiple ownership rules to forbid Grade B overlaps between commonly owned stations, but divestiture by Greenville was not required.

FCC to improve its broadcasting facilities. The application proposed the addition of a much taller transmitting tower for WECT-TV. This would have increased the Grade B overlap of WNCT-TV and WECT-TV area and population from 15.9 percent to 41.5 percent and from 15 percent to 50.1 percent, respectively. On January 12, 1966, the FCC granted the application subject to the condition that construction could not be commenced until it had been notified in writing that (a) neither Roy H. Park nor his wife, Dorothy D. Park, was or would be an officer, director, or part of Atlantic's management, and (b) Park's rights to vote his stock to appoint or require the election or appointment of any officer or director were abrogated. The grant subject to the condition became final in 1967 after the FCC denied Atlantic's petition for reconsideration and the U.S. Court of Appeals for the District of Columbia Circuit affirmed the FCC's action.

The Parks resisted the condition, principally on the ground that Greenville considered it necessary to have representation on Atlantic's board of directors because of Greenville's substantial investment in Atlantic. In an effort to reach a compromise, Atlantic filed an application with the FCC on July 31, 1967, requesting consent to transfer legal and operational control of the company to J. S. Brody as trustee for 60 percent of the stockholders (other than the 30-percent Greenville interest and another 10-percent minority interest). Atlantic alternatively requested the Commission to modify the condition and the construction permit if the voting trust agreements and the related transfer of control would not effect compliance with the conditions of the grant. The FCC then posed an "alternative condition" that Roy H. Park and Dorothy D. Park not be officers of Atlantic and that they remove themselves from actions of the board of directors of Atlantic with respect to the operation of television station WECT-TV. In October 1967, Roy H. Park advised the FCC that the "alternative condition" was also unacceptable.

On December 13, 1967, the FCC considered Atlantic's proposals and informally advised Atlantic that its proposals, including the application filed on July 31, 1967, did not meet the conditions of the construction permit, and that the Commission had directed the preparation of a letter which, among other things, included the statement that any grant of

the next WNCT-TV license renewal application would be conditioned upon Roy H. Park's and Dorothy D. Park's resigning as directors of Atlantic. Atlantic informally requested that the Commission defer its actions on the proposals until the stockholders of Atlantic could solve the problem.

On March 5, 1968, Greenville sold to Atlantic the 12,285 shares of Atlantic's issued and outstanding common voting stock for $1,200,000. Also, in consideration for entering into a noncompetition agreement with Atlantic on March 1, 1968, Atlantic paid Roy H. Park $300,000. In December of 1968, Greenville reinvested the $1,200,000 when its wholly owned subsidiary, Midwest, acquired radio stations WEBC-AM, KRSI-AM, KRSI-FM, and WNAX-AM from Area-wide Communications, Inc., for $2,900,000.

On both its original and first amended Federal corporate income tax returns for its taxable year ended June 30, 1968, filed on September 20, 1968, and August 11, 1969, respectively, Greenville reported a long-term capital gain in the amount of $789,960.17 on its sale of its 30-percent interest (12,285 shares of stock) in Atlantic and paid the tax on such gain. It subsequently was determined that Greenville realized long-term capital gain in the amount of $896,314.51, not $789,960.17 as originally reported. At the time of filing of each of these returns, Greenville had not applied to the FCC for a tax certificate pursuant to section 1071.[27]

From September 27, 1956, to July 16, 1970, the FCC only issued a tax certificate pursuant to section 1071 if the requesting broadcasting licensee could establish that he involuntarily disposed of his broadcasting facilities, interests, or holdings due to a change in FCC policy or rules which made the retention of the facility, holding, or interest inconsistent with such policy or rules.

On July 16, 1970, this policy was changed such that a certificate would be issued if the FCC determined that there was a causal relationship between the adoption of a new FCC policy and the sale in question, and that the issuance of the certificate was necessary or appropriate to effectuate the new FCC policy.

---

[27]In short, sec. 1071 allows, upon certification by the FCC, certain sales or exchanges of property to be treated as involuntary conversions within the meaning of sec. 1033.

On October 30, 1970, Greenville filed an application with the FCC in which it requested the FCC to issue it a section 1071 tax certificate in connection with the 1968 sale of its 30-percent interest in Atlantic. On April 14, 1971, the FCC denied Greenville's request for a tax certificate because "there was no causal relationship because the licensee [Atlantic] was not forced to choose between the improvement of [WECT-TV's] facilities and Park's [Greenville's] continued ownership in the [WECT-TV] station."

On May 14, 1971, Greenville petitioned the FCC for reconsideration of its denial of Greenville's request for a section 1071 tax certificate. On July 19, 1972, the FCC reconsidered its original denial and voted to issue the tax certificate to Greenville, with one FCC Commissioner not participating and another dissenting. The FCC decided that the sale was "governed by the ordinary involuntary test" and was in fact involuntary and "necessary and appropriate to effectuate compliance with a change in policy in the Commission's multiple ownership rules, prohibiting overlap of Grade B contours of television stations under common control."

After the issuance of the tax certificate and over 4 years after it filed its original Federal corporate income tax return for its taxable year ended June 30, 1968, Greenville filed a Form 843 claim for a refund of an overpayment in taxes for the taxable year ended June 30, 1968, in the amount of $95,068.96. The form was received by the IRS on October 2, 1972. Greenville claimed that the refund arose pursuant to its right to defer taxation of 52.37 percent[28] of the gain realized on its sale of 12,285 shares of Atlantic stock by treating the sale on that portion as a section 1033 involuntary conversion as permitted by section 1071.

On March 30, 1973, Greenville filed a second amended Federal corporate income tax return for its taxable year ended June 30, 1968, electing to treat 52.37 percent of the gain it realized on the Atlantic stock sale as an involuntary conver-

---

[28]The parties have stipulated that, of the total consideration received by Greenville on the sale of its Atlantic stock, 37.5 percent, rather than 52.37 percent, was properly allocable to Atlantic's ownership of WECT-TV and the broadcast assets and properties ancillary thereto.

sion and claiming a refund of $95,068.96. Respondent issued on May 18, 1973,[29] a notice of deficiency to Greenville for its taxable year ended June 30, 1968, denying the requested deferral of the taxation on the gain from the stock sale. Thereafter, on August 14, 1973, Greenville filed a third amended return for the taxable year ended June 30, 1968, again seeking deferral and a refund.

## OPINION

### I. TELEVISION AFFILIATION CONTRACTS

The first issue to be decided is whether petitioners are entitled to amortize a portion of their basis in each of four television network affiliation contracts. The specific television affiliation contracts at issue are: (1) The Greenville contract with CBS, which was acquired by Greenville on March 15, 1962, at which time Greenville had a basis in the contract of $434,640; (2) the Roanoke contract with NBC which had a basis as of the date of acquisition in September 1969 in the amount of $2,097,471; (3) the Johnson City contract with CBS having a $624,500 basis as of June 12, 1964, the date of purchase;[30] and (4) the Richmond contract with CBS, which was acquired on November 15, 1965, and carried a basis of $2,207,851.[31]

The controversy centers upon section 167(a), which allows "as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business." Section 167(b) defines the term "reasonable allowance" as including an annual allowance computed under the straight-line method.

A network affiliation contract is an intangible asset of the station. *Roy H. Park Broadcasting, Inc. v. Commissioner*, 56 T.C. 784, 805 (1971). Such an asset can be subject to depreciation or amortization if the proper conditions are met. Section 1.167(a)–3, Income Tax Regs., provides in part as follows:

---

[29]On July 12, 1971, respondent and Greenville executed a Form 872-A extending the period of limitations for assessment for Greenville's taxable year ended June 30, 1968.

[30]See note 25 *supra*.

[31]The amortization of Utica-Rome's basis in its affiliation contract with ABC is no longer in controversy.

Sec. 1.167(a)–3. Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. * * *

Thus, in order for the owner of an intangible asset to amortize such asset, it is necessary that the asset have a limited useful life. *Gulf Television Corp. v. Commissioner*, 52 T.C. 1038, 1066 (1969); *Westinghouse Broadcasting Co. v. Commissioner*, 36 T.C. 912, 919 (1961), affd. 309 F.2d 279 (3d Cir. 1962), cert. denied 372 U.S. 935 (1963).

According to section 1.167(a)–1(b), Income Tax Regs.—

For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. * * *

The facts existing at the close of the taxable year at issue are those to be considered in making a determination of useful life. *Roy H. Park Broadcasting, Inc. v. Commissioner, supra* at 805; sec. 1.167(b)–0, Income Tax Regs.

Petitioners have the burden of establishing the reasonableness of their amortization deductions. *Welch v. Helvering*, 290 U.S. 111 (1933), Rule 142(a), Tax Court Rules of Practice and Procedure; sec. 1.167(b)–0, Income Tax Regs.

On petitioners' Federal income tax returns for the years in dispute, amortization apparently was claimed as a percentage of the respective petitioner's entire basis in each of the four affiliation contracts. Acknowledging the large body of law that opposed that position, petitioners have dropped their argument that the entire basis of each contract is subject to

amortization and now argue that only a large portion of such basis is amortizable.

Specifically, petitioners argue that a television network affiliation contract is divisible into three component parts and that one such component, the "network revenue component," is a wasting asset for which a useful life can be established. Citing the fact that amortization of the cost of television affiliation contracts as a whole generally has been denied by the courts, petitioners state that "the instant case presents a legal question and factual analysis * * * completely distinguishable from all of the prior cases dealing with television network affiliation contracts."

The success of petitioners' argument hinges upon the validity of several propositions. First, we must find that the basis of the television affiliation contracts can be severed into separate components for purposes of determining whether one such component can be amortized. If we so find, then it is up to petitioners to prove that such component is a wasting asset and that such asset has a reasonably determinable useful life. Sec. 1.167(a)–3, Income Tax Regs.

Petitioners contend that for purposes of amortization, the affiliation contracts are divisible into (1) the "network revenue component," i.e., the source of revenue embodied in the direct compensation by the network to the station for the broadcasting of network programing, (2) the "adjacency component," i.e., revenue derived from the station's right to sell advertising time that is adjacent to or contained within network programing, and (3) the "programing component," i.e., the provision by the network of free programing to the station, thereby obviating large program costs that otherwise would have been incurred by the station. Petitioners argue that the network revenue component is a wasting asset and have attempted to establish useful lives for that portion of each of the four affiliation contracts that are at issue in this case.

For the sole purpose of resolving this current dispute, we shall assume that the affiliation agreement is divisible and that the petitioners have appropriately allocated the basis of the agreement among its components. On the basis of their calculations, petitioners determined that, at acquisition date, the network revenue components of the four television affiliation contracts at issue herein were in the following amounts:

Greenville—$339,400, Johnson City—$390,300, Richmond—$983,800, Roanoke—$1,258,100. These amounts constituted 78 percent, 62 percent, 45 percent, and 60 percent, respectively, of the total investment by the respective owners in the network affiliation contracts.[32] Petitioners contend that because these

---

[32]We have made the above assumption since it does not affect our conclusion herein. However, we cannot help noting that the assumption that petitioners' calculations are correct is a generous one. The method for calculating the alleged depreciable basis of the contracts was as follows: The amount paid by the affiliated network to the affiliate for broadcasting the network's programing (that is, the network revenue) prior to the year of acquisition by petitioners was used as a starting point for deriving the value of the network revenue component. Petitioners assumed that network revenue eventually would decline to zero over a period of years. Thus, assuming straight-line diminution, petitioners computed the average network revenue over the remaining useful life, as determined by petitioners, of each of the contracts to be one-half of the preacquisition network revenue. This average amount was then discounted by the net servicing costs that allegedly would be incurred by the stations in obtaining network revenue. The discounts were of 10 percent for all four stations. Additionally, this figure was discounted in the amount of 32 percent for Greenville and 22 percent for Johnson City to take into account the loss in network revenue that would result from the predictable loss of the secondary affiliations of these two stations, and in the amount of 15 percent for Greenville and 10 percent for Johnson City to adjust for the loss of leverage (or bargaining power) that would result when a third station predictably would enter a two-station market. Finally, the Roanoke average was reduced by a "facility improvements" discount of 10 percent. The resultant total discounts for Greenville, Johnson City, Richmond, and Roanoke were 57 percent, 42 percent, 10 percent, and 20 percent, respectively. These percentages were applied to the average network revenue to reach the net average benefit over the useful life of the contract of $68,000 for Greenville, $78,400 for Johnson City, $197,600 for Richmond, and $205,300 for Roanoke. Assuming that each of the stations would receive these yearly amounts for the remaining useful life of the network component, petitioners calculated that the present value of such component was $339,400 for Greenville, $390,300 for Johnson City, $983,800 for Richmond, and $1,258,100 for Roanoke. In reaching these amounts, petitioners applied a 20-percent-uncertainty discount to the Greenville, Johnson City, and Richmond stations, and a 15-percent-uncertainty discount to the Roanoke station. These were the amounts that were used by petitioners as the bases for amortization of the network component.

We find these calculations to be highly dubious. It is essential to the accuracy of petitioners' calculations that the network revenue component have a limited useful life and that such life be of the duration determined by petitioners. Finding, as we do, that such useful life cannot reasonably be determined, petitioners' derivation of the value of the network revenue component simply collapses. Other serious defects involve the percentage discounts used by petitioners in deriving their results. The calculations were made by petitioners' expert, Mr. Gross, who stated in his testimony that the 10-percent discount for service costs attributable to receiving network revenue was based upon his personal opinion and was derived without reference to actual costs. Apparently, the discounts for the loss of a secondary network affiliation were also derived by rough estimate and without reference to particular data, as were the discounts for loss of leverage. Finally, the uncertainty factor which in three cases resulted in a discount of 20 percent and in one case resulted in a discount of 15 percent was based upon Mr. Gross's rough conjecture of the uncertainties that would befall the industry over the next 30 to 35 years. These discounts were not obtained in a manner that achieves a level of accuracy satisfactory to this Court. Petitioners have the burden of proving the amount of the depreciable basis of their contracts. Such crude computations fall short of the standard necessary for success in such an endeavor.

amounts constitute the bases in the wasting portions of the affiliation contracts, amortization deductions should be allowed based upon the respective useful lives of each of the network revenue components. Petitioners' contention is meritorious only if they can establish that the network revenue component of each contract is a wasting asset having a reasonably determinable useful life. This, they have failed to do, and, consequently, we will not rule on their basic premise that the affiliation contracts can be broken into components.

Petitioners, of course, bear the burden of proof. Their expert, Mr. Horace Gross, presented two studies which indicated that network revenue was decreasing in relative importance as a source of station revenue. In one of these studies, which was based upon information gathered for the years 1957 through 1979, Mr. Gross compared network revenue with gross broadcast revenue for all stations in markets with three or more stations. This study showed a steady decline in network revenue as a percentage of total revenue received by the stations. Mr. Gross's second study was limited to those markets ranked from 50 through 110 by size of audience as of 1970. Each of the Park stations fell within this group of markets. He further refined his analysis to cover only what he perceived to be the most analogous markets to the Park markets. Thus, basing his conclusions on his study of the resulting 32 markets, Mr. Gross determined that network revenue as a percentage of net broadcast revenue, that is, gross broadcast revenue less commissions paid, declined in relative importance even more sharply than the industry-wide results.

Finally, Mr. John Babcock, executive vice president of Roy H. Park Broadcasting, Inc., testified that network revenue as a contributor to the operating profit of the stations underwent a dramatic decline in relative importance since the acquisition of the particular stations by petitioners herein.

All three of these accounts stress the comparative trends of network and non-network revenue. The comparisons show that non-network revenue is growing dramatically in importance to the local affiliates. Petitioners submit these findings in an effort to prove that network revenue is a wasting asset.

With all their graphs and curves and points and lines and colors and figures, petitioners are unable to disguise one very

inescapable and fundamental fact: network revenue, in absolute rather than relative terms, was rising at the time the affiliation contracts were entered into and continued to rise thereafter. This is true with respect to the four stations at issue herein as well as the industry as a whole. Standing alone, proof that the ratio of network revenue over total broadcasting revenue is a declining ratio is meaningless. We are concerned here with the wasting nature of the numerator, not of the fraction as a whole; the value of the network revenue component is measured in dollars, not percentage points. Faced with the fact that, subject to occasional fluctuations, network revenue payments have increased steadily over the years, we find it very difficult even to accept the notion that the network revenue components of the affiliation contracts were wasting assets.

Petitioners' expert, Mr. Gross, explained that network programing costs were becoming prohibitively high, thereby forcing the networks to curtail payment of network revenue to the stations. However, we need more specific and reliable evidence of the financial pressures and practices of the national television networks in order for us to conclude that the network-affiliate relationship is to be altered in such a dramatic manner. If network revenues are to be terminated, it is the networks that will make the decision. Because network revenue has held steady over the years, it does not appear that that decision has yet been made. Without better evidence with respect to the networks, the predicted termination of network revenue is speculative.[33]

While the foregoing discussion could easily lead to a conclusion that the network revenue components of the affiliation contracts were not wasting assets, it does, under any perspective, add support to our holding that petitioners have failed to establish that each of the network revenue components has a definitive life.

In an effort to establish a useful life for the network revenue

---

[33]We recognize the argument made by petitioners that if the percentage of network revenue over total station revenue declines to a miniscule amount and if there is pressure from the networks to discontinue revenue payments due to their relative insignificance within the totality of station revenue, then there someday may be a time when network revenue payments are cut off. We simply do not have enough evidence to find that this event is reasonably foreseeable.

components of the affiliation contracts, petitioners submitted a very crude, simplistic study. For each station, petitioners calculated the percentage of network revenue to total station revenue for the year of acquisition of the station. The same figure was computed for the year 5 years prior to acquisition. For the Greenville station, it was determined that the ratio would fall by 3 percentage points during such 5-year period, yielding an average annual decline of 0.6 percent per year. Thus, assuming a constant yearly diminution by 0.6 percent, petitioners predicted that the 21-percent ratio determined to exist in 1962 (Greenville's year of acquisition) would fall to zero in 35 years (21/0.6 = 35). Similar computations were undertaken for the other three stations at issue, giving the following results:

| | Greenville | Johnson City | Richmond | Roanoke |
|---|---|---|---|---|
| Acquired | 1962 | 1964 | 1964–65 | 1969 |
| *Percentage of network revenue to total station revenue* | | | | |
| 5 years prior to acquisition | 24% | 21% | 21% | 18% |
| Year of acquisition | 21% | 18% | 18% | 14% |
| Average annual decline | 0.6% | 0.6% | 0.6% | 0.8% |
| Estimated remaining useful life | 35 years | 30 years | 30 years | 18 years |
| Estimated termination year | 1997 | 1994 | 1994 | 1987 |

We do not believe that this method establishes the useful lives of the network revenue components with reasonable accuracy. Respondent's expert witness, Mr. Archer, who is himself a professional statistician, testified that no professional statistician would have used two points on a 5-year trend line[34] to make a projection 35 years into the future. We, too, find difficulty with such an extrapolation.

The study submitted by petitioners utilized data from markets with three or more stations. Such markets include unaffiliated stations, a fact which would artificially lower the percentage of network revenue to total station revenue. Similarly, the tabulations are further distorted by the fact

---

[34]Petitioners never established why a 5-year trend line was appropriate for their purposes.

that there was no adjustment for the commissions and program costs that cut deeply into total station revenue. A more revealing comparison would have been between net network revenue and net total station revenue.

Finally, we must emphasize once again that it is not percentage fluctuations with which we are concerned. The fact that non-network revenue is increasing at a faster pace than network revenue does not prove that the latter is a wasting asset. Petitioners insist upon making percentage "points." We need hard facts about dollars.

As we said in *Gulf Television Corp. v. Commissioner*, 52 T.C. 1038, 1056–1057 (1969), "the statute has been construed as permitting a reasonable allowance for the depreciation of an intangible asset only if its duration can be ascertained with 'reasonable certainty' or 'reasonable accuracy.'" While we recognize that this standard does not require precision, we believe that a higher level of proof is necessary than has been presented in the instant case. Petitioners cannot rest their assertions on "indefinite expectations and suppositions." *Gulf Television Corp. v. Commissioner, supra* at 1063–1064. See also *Miami Valley Broadcasting Corp. v. Commissioner*, 204 Ct. Cl. 582, 499 F.2d 677, 686–687 (1974).

## II. Radio Affiliation Contracts

The second issue to be decided is whether petitioners are entitled to amortize their basis in each of five radio network affiliation contracts. Again, resolution of this issue depends on whether petitioners can sustain their burden of proving a useful life for these contracts. Unlike the television affiliation contract issue, however, petitioners are not attempting to amortize a component part of the contract. They are instead claiming that the entire contract has a determinable useful life and therefore is amortizable.

Petitioners point to a relative lack of stability in the radio network-affiliate relationship. Much of this instability was, and continues to be, attributable to the rapid growth and continuing development of the television industry. Because of the popularity of television, radio networks provide less and less network programing to their affiliates. Some of this programing is somewhat specialized and directed toward a particular limited audience. As a consequence, there are

frequent changes in affiliation by stations seeking formats more compatible with their audiences' tastes, or seeking formats that will have broader overall appeal. Based upon these facts and upon a statistical analysis undertaken by petitioners' expert, Mr. Gross, petitioners argue that the reasonably determinable useful life of a radio network affiliation contract was approximately 15 years during the years at issue.

Using 1975 as a base year, petitioners' statistical study identified all AM radio stations on the air during that year and proceeded to trace each station's affiliation history back to the year 1956. The data for each station in the study was then extended to 1980. Mr. Gross then tabulated the number of terminations of affiliation contracts by affiliated stations over this period of years and assembled the following table:

| Number of terminations | Average life in years[2] | Stations observed | Weighted life (life × times observed) |
|---|---|---|---|
| 0 | 25 | 976 | 24,400 |
| 1 | 12.50 | 1,213 | 15,163 |
| 2 | 8.33 | 514 | 4,282 |
| 3 | 6.25 | 211 | 1,319 |
| 4 | 5 | 60 | 300 |
| 5 | 4.17 | 8 | 33 |
| 6 | 3.57 | 4 | 14 |
| 7+[1] | 2.78 | 1 | 3 |
| | | 2,987 | 45,514 Weighted life |

$$\frac{45,514}{2,987} = 15.2 \text{ years average}$$

[1]Assumed eight terminations for caluculation.
[2]25 divided by (number of terminations + 1).

Using a weighted-average approach, Mr. Gross computed a useful life of a radio network affiliation contract of 15.2 years. He stated that his study was limited to AM stations since all of the contracts in issue were AM affiliation contracts with the exception of one AM/FM simulcast relationship.

Respondent launches a number of attacks upon petitioners' results. First, respondent contends that an industry-wide statistical study is not the proper means for proving the useful life of particular contracts. The disparity between Mr. Gross's computation and the actual experience of petitioners' stations is urged as support for this assertion. Respondent also argues that Mr. Gross's derivation of average useful life is inaccurate

due to the fact that it wrongfully failed to include a history of terminations of affiliated FM radio stations, and because it failed to take into account the particular market in which the station is located. He asserts that the size of the broadcasting market would have an effect on the terms of the affiliation contract and therefore on the frequency of terminations. To correct for this, respondent maintains that petitioners should have divided the surveyed stations into market size and only used the markets corresponding to petitioners' stations in order to establish a useful life for the affiliation contracts of such stations.

With respect to this issue, petitioners have placed virtually their entire case upon the back of the statistical analysis of Mr. Gross. Unfortunately, it is not strong enough to carry their burden of proof. The fundamental flaw undermining the study lies in the artificial termination that is created for each station. For instance, there were 976 stations observed that never terminated their affiliation contracts. These were given an average life of 25 years, that is, the period of time under observation. Assigning a 25-year life to contracts that have not been terminated over the entire 25-year period observed undoubtedly warps the results to the benefit of petitioners. This is especially true in view of the fact that the 976 stations observed which had never experienced a contract termination constituted almost one-third of the total stations observed.

Stations observed to have terminated once during the 25-year period numbered 1,213. Again, a hypothetical termination was created in the last year of study, for each associated contract was assigned an average life of 12½ years. Assuming, as we safely can, that most of the 1,213 stations did not terminate their affiliations immediately after 1980, then, clearly, the average life of their affiliation contracts will exceed, and possibly greatly exceed, the average life assigned to them by Mr. Gross. This same flaw encumbers the remainder of the survey, although the bias is not as severe since only approximately one-fourth of the stations observed experienced more than one contract termination.

Additionally, we believe that Mr. Gross's survey failed to

take into account the effect of a contract's past duration on its expected life,[35] and the effect of market size on a contract's useful life. See *Roy H. Park Broadcasting, Inc. v. Commissioner*, 56 T.C. 784, 804 (1971). Besides a number of additional minor flaws that contribute to the general inaccuracy of petitioners' analysis, we feel that the major deficiencies discussed above are fatal to petitioners' case. Accordingly, we find that petitioners have failed to carry their burden of proof with respect to the useful life of the radio network affiliation contracts and consequently that they cannot amortize their bases in these contracts as claimed.

## III. SECTION 1071 ELECTION

The final issue for decision is whether petitioner Greenville made a timely election pursuant to section 1071 to treat its sale of 12,285 shares of stock of Atlantic Telecasting Corp. as an involuntary conversion within the meaning of section 1033. Section 1071(a) provides as follows:

SEC. 1071. GAIN FROM SALE OR EXCHANGE TO EFFECTUATE POLICIES OF F. C. C.

(a) NONRECOGNITION OF GAIN OR LOSS.—If the sale or exchange of property (including stock in a corporation) is certified by the Federal Communications Commission to be necessary or appropriate to effectuate a change in a policy of, or the adoption of a new policy by, the Commission with respect to the ownership and control of radio broadcasting stations, such sale or exchange shall, if the taxpayer so elects, be treated as an involuntary conversion of such property within the meaning of section 1033. * * * Any election made by the taxpayer under this section shall be made by a statement to that effect in his return for the taxable year in which the sale or exchange takes place, and such election shall be binding for the taxable year and all subsequent taxable years.

The regulations under section 1071 provide that, in order for a taxpayer to receive the benefits of section 1071, he must make the proper election and file a certificate issued by the FCC with the Commissioner of Internal Revenue or the District Director. Sec. 1.1071–1(a)(1), Income Tax Regs. Section 1.1071–4(a), Income Tax Regs., provides that "an election under

---

[35]It might be expected that long affiliation creates a stability between station and network that provides added assurance against termination of such relationship. Thus, stations that have remained affiliated with a single network for an uninterrupted 25-year period have affiliation contracts whose useful life might exceed the overall average.

section 1071 must be filed with the return for the taxable year in which the sale or exchange occurs. Where practicable, the certificate of the Federal Communications Commission required by sec. 1.1071–1 should be filed with the election."

In our case, petitioner Greenville was unable to secure a certificate at the time it filed its return for the taxable year 1968. Thereafter, the FCC broadened its policy so that the particular circumstances arising in the sale by Greenville of its Atlantic Telecasting Corp. stock satisfied the requirements for the issuance of a certificate under section 1071. After an initial denial upon application for a certificate, Greenville received its certificate on July 19, 1972, over 4 years after the filing of its original Federal corporate income tax return for the taxable year ended June 30, 1968. Greenville then filed for a refund based on its alleged right to treat the sale as a section 1033 involuntary conversion. Thereafter, Greenville filed a second, and then a third, amended Federal corporate income tax return seeking such treatment.

Respondent argues that the election to defer gain recognition pursuant to section 1071 must be made with the filing of the original return and consequently cannot be made in the first instance on a subsequent amended return filed after the due date of the original return. Respondent argues that the term "return" generally refers only to original returns.

Petitioners argue that the making of the 1071 election, for practical purposes, should not be limited to an original return. At the time of filing its original return, Greenville was under the reasonable belief that a certificate would not be issued to it since its sale of property was voluntary in nature. After the taxable year in question, the FCC changed its policy in this regard,[36] and Greenville was able to obtain a certificate for the June 30, 1968, taxable year.

In *Goldstone v. Commissioner*, 65 T.C. 113, 116 (1975), we stated that prior cases upholding the validity of elections made in amended returns had fallen within one of three factual contents: (1) The amended return was filed prior to the date prescribed for filing returns; (2) the taxpayer's treatment of the contested item in the amended return was not inconsistent

---

[36]See *Jefferson Standard Broadcasting Co. v. F. C. C.*, 297 F. Supp. 784 (W.D. N.C. 1969).

with his treatment of that item in his original return; or (3) the taxpayer's treatment of the item in the original return was improper, and the taxpayer elected one of several allowable alternatives in the amended return. The instant case does not fit within any of these three general rules. However, because of the unique circumstances in this case, we believe that Greenville should be allowed to make the section 1071 election in its amended return.

There is nothing in section 1071, the regulations thereunder, or in its legislative history indicating that the election must be made on the taxpayer's "original" return. The statutory law and its implementing regulations only require the election to be made on the return for the year of sale. This does not preclude the possibility that the election can be made on an "amended" return for the year of sale.

Such a possibility has become an actuality in a similar context of the tax law. Specifically, the regulations under the old section 453[37] provided that in electing to report gain on the installment method, the taxpayer "must set forth in his income tax return * * * for the year of the sale or other disposition the computation of the gross profit on the sale or other disposition under the installment method." Sec. 1.453–8(b)(1), Income Tax Regs. Thus, as does section 1071, the old section 453 required election in the income tax return for the year of sale.

This fact has not prevented courts from creating judicial exceptions allowing the section 453 election to be made on amended returns under certain circumstances. See *Bookwalter v. Mayer*, 345 F.2d 476 (8th Cir. 1965); *Reaver v. Commissioner*, 42 T.C. 72, 80 (1964); *Glidden Co. v. United States*, 241 F. Supp. 195 (N.D. Ohio 1964).[38] In general, the courts in these cases recognized that, if Congress or the Treasury had wished that the election be limited to the original return for the year of sale, they easily could have made this explicit. Their failure to do so indicates that no such absolute limitation exists.

The facts in this case seemingly run head on into the

---

[37]Sec. 453 was amended significantly by the Installment Sales Revision Act of 1980, Pub. L. 96–471, 94 Stat. 2247.

[38]See also *Estate of Broadhead v. Commissioner*, T.C. Memo. 1972–195; *Griffin v. Commissioner*, T.C. Memo. 1965–91.

Supreme Court's pronouncement in *Pacific National Co. v. Welch*, 304 U.S. 191 (1938). In that case, the Court warned:

Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns (sec. 53(a)) to include the period allowed for recovering overpayments (sec. 322(b)). There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method. * * * [*Pacific National Co. v. Welch, supra* at 194.]

In short, once the taxpayer makes an elective choice, he is stuck with it. Of course, as indicated in *Goldstone v. Commissioner, supra* at 116, the courts have found ways to circumvent the broad rule of *Pacific National Co. v. Welch, supra*, when the need arises.

In the instant case, at the time Greenville was required to file its original return for 1968, it had no reasonable choice but to forego the section 1071 election. A certificate from the FCC was a precondition to receiving the tax benefits of section 1071, and under the law as it then stood, no such certificate would be forthcoming. Under such circumstances, making a section 1071 election would have created a futile posture that with reasonable foreseeability would have required rectification at the mutual expense and burden of both Greenville and respondent.

The FCC's retroactive change in policy subsequent to the tax year in question is the true source of this controversy. As soon as petitioner Greenville was apprised that it was entitled to a certificate, it applied for it, received it, and filed a refund claim and two amended returns seeking to make the election.

This is a highly unusual situation that calls for a reasonable interpretation that is consistent with the apparent intent of the statute. The certificate under section 1071 simply constitutes the reporting of an objective fact by the FCC. It certifies that the sale of property was "necessary or appropriate to effectuate a change in a policy of, or the adoption of a new policy by, the Commission with respect to the ownership and control of radio broadcasting stations." See *Jefferson Standard Broadcasting Co. v. F. C. C.*, 297 F. Supp. 784, 789 (W.D. N.C. 1969). Such certification was clearly intended to allow the taxpayer to choose to reap the section 1071 benefits if he so

desired. With certificate in hand prior to the filing of his original return, or with the assurance that it is legally forthcoming, the taxpayer is faced with an elective choice and can either seize or eschew the tax benefits of section 1071. However, where under current law the taxpayer correctly perceives that the circumstances of his sale or exchange are not those that give rise to FCC certification, then he is not faced with a choice between two alternatives, and his only reasonable reporting position is to treat the sale or exchange as if section 1071 does not apply. Under such circumstances, respondent would urge that a subsequent receipt of FCC certification should be of no benefit to the taxpayer. Respondent basically argues that, since Greenville did not make the section 1071 election in its original return, the certificate in the instant case is meaningless and can have no tax consequences.

We see the matter differently. To make an election, one must have a choice. Certainly, an election is to be exercised when the occasion for doing so arises. See *Reaver v. Commissioner, supra* at 81. Here, Greenville made the election at its first opportunity. Throughout the entire episode, it acted reasonably and in good faith. We believe, under the unique facts before us, that the election should be allowed. We emphasize that our decision is limited to these facts.[39]

Respondent argues that allowing petitioner Greenville to make the section 1071 election in an amended return would impose the "burdensome uncertainties upon the administration of the revenue laws" that was feared in *Pacific National Co. v. Welch, supra* at 194. We disagree. If we totally foreclose Greenville from the section 1071 benefits, we will be guilty of allowing what might be the administratively convenient result to prevail over the just result. If respondent is suggesting, as he did at trial, that petitioner should have filed a section 1071 election with the original return for 1968 in optimistic reliance upon an eventual receipt of a section 1071 certificate from the

---

[39]The path we take is not totally untrodden. See *United States v. Woodmansee*, 578 F.2d 1302 (9th Cir. 1978); *Gentsch v. Goodyear Tire & Rubber Co.*, 151 F.2d 997 (6th Cir. 1945); *Lucas v. Sterling Oil & Gas Co.*, 62 F.2d 951 (6th Cir. 1933); *Reaver v. Commissioner*, 42 T.C. 72 (1964); *Bayley v. Commissioner*, 35 T.C. 288, 297–299 (1960). See especially *Dougherty v. Commissioner*, 60 T.C. 917, 938 (1973), a decision closely analogous to this one. See also *Taylor v. Commissioner*, 67 T.C. 1071 (1977).

FCC, then he is overlooking the burdensome uncertainties created by that choice of conduct. If this had been done and the FCC had not changed its policies, then, at some unknown point in the future, respondent presumably would have had to deny Greenville's election because it was not accompanied by a certificate from the FCC and would have had to straighten out the tax chaos resulting from the "improper" reporting of the sale of the radio broadcasting property. Filing a section 1071 election based on an expected receipt of an FCC certificate when such receipt is unlikely under current law certainly would impose the "burdensome uncertainties upon the administration of revenue laws" that respondent fears. The right to elect is only certain when the receipt of the certificate is certain. Until the latter occurs, the taxpayer has no meaningful choice between alternatives. Therefore, we hold for petitioner Greenville on this issue and allow it the benefits of the election which was made on its amended return.[40]

*Decisions will be entered under Rule 155.*

---

[40]In his reply brief, respondent raised for the first time several other objections to Greenville's use of sec. 1033. These arguments were not raised prior to or at trial. To overcome them, Greenville would be required to present additional proof. Because the raising of such issues was untimely and constitutes unfair surprise, and our consideration of them would be to the substantial prejudice of Greenville, we refuse to consider them. See *Estate of Horvath v. Commissioner,* 59 T.C. 551, 555 (1973).